# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 16, 2021        Decided May 21, 2021

No. 20-5144

JENS PORUP,
APPELLANT

v.

CENTRAL INTELLIGENCE AGENCY,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-00072)

———

*Kelly B. McClanahan* argued the cause and filed the briefs for appellant.

*Joshua K. Handell*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *Jeffrey Bossert Clark*, Acting Assistant Attorney General, and *H. Thomas Byron III*, Attorney.

Before: HENDERSON and KATSAS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: In 2015, Appellant Jens Porup submitted a Freedom of Information Act ("FOIA") request to Appellee Central Intelligence Agency (the "Agency" or "CIA") seeking "any [and] all documents relating to CIA use of poison for covert assassination." Compl. ¶ 17, Joint Appendix ("J.A.") 14. On May 21, 2015, the CIA refused to process Porup's request because Executive Order 12,333 makes it unlawful for federal employees to engage in assassination or conspiracy to assassinate. *See* 46 Fed. Reg. 59,941, 59,952 (Dec. 4, 1981). In other words, the CIA initially refused to process the disputed FOIA request because it pertained to matters that were arguably beyond the scope of the Agency's primary mission. In January 2017, after Porup and the CIA were unable to resolve their differences, Porup filed a complaint in the District Court alleging that the Agency had failed to comply with FOIA in responding to his specific request. He also alleged that the Agency had a "pattern or practice" of violating FOIA by categorically refusing to process requests seeking information related to conduct in which the CIA believes it cannot lawfully engage.

In the months after Porup submitted his FOIA request, the CIA adopted a revised approach to process requests of the sort submitted by Porup. According to the CIA, under this new policy, Agency personnel are prohibited from "declin[ing] to process [FOIA] requests solely because they pertain to activities or issues that are beyond the scope of the Agency's primary mission." Decl. of Antoinette B. Shiner, Information Review Officer for the Litigation Information Review Office, CIA (hereinafter "Declaration" or "Decl.") ¶ 18, J.A. 47. Agency personnel are now "required to engage in a context dependent inquiry as to whether a search may be possible, and

whether the Agency's records repositories are likely to contain responsive materials." *Id*. After adopting this new policy, the CIA identified and released a number of documents that were responsive to Porup's FOIA request. The Agency then moved for summary judgment, arguing, among other things, that it had completed its response to Porup's request, and that the Agency's implementation of its new policy had mooted Porup's pattern or practice claim.

In opposition, Porup argued that the Agency had not carried its burden on mootness, had not demonstrated the sufficiency of its searches for responsive documents, and that its withholdings and redactions were insufficiently justified. The District Court rejected Porup's arguments and granted the Agency's motion for summary judgment. Porup now appeals the District Court's judgment on several grounds. We affirm the District Court.

The Agency has adopted a new policy that adequately addresses any pattern or practice it had of violating FOIA in the manner alleged by Porup, rendering that cause of action moot. In addition, we find no merit in any of Porup's specific challenges to the Agency's search methodology, withholdings, or redactions. Finally, although the District Court failed to make any findings of segregability regarding the information to be withheld, we exercise our discretion to do so. On the record before us, we agree with the Agency that Porup has not "[o]vercome CIA's [u]nrebutted [a]ttestation" that it disclosed all reasonably segregable non-exempt material. Appellee's Response Br. 46.

## I. BACKGROUND

On May 1, 2015, Porup submitted a FOIA request to the Agency for "any [and] all documents relating to CIA use of poison for covert assassination." Compl. ¶ 17, J.A. 14; *accord*

Def.'s Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J. (hereinafter "Summ J. Statement"), Ex. 1 at 2, J.A. 23. On May 21, 2015, the Agency responded that it had declined to process Porup's request, because an executive order has made it unlawful for federal employees to engage in assassination or conspiracy to assassinate. *See* Exec. Order No. 12,333, 46 Fed. Reg. 59,941, 59,952 (Dec. 4, 1981). Similar orders date back to the 1970s. *See* Exec. Order No. 12,036, 43 Fed. Reg. 3674, 3687 (Jan. 24, 1978); Exec. Order No. 11,905, 41 Fed. Reg. 7703, 7733 (Feb. 18, 1976).

Approximately two weeks later, Porup replied to the Agency, observing that the U.S. Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities, also known as the "Church Committee," had published a 1975 interim report concluding that the Agency played a role in assassination plots. *See* CHURCH COMMITTEE, ALLEGED ASSASSINATION PLOTS INVOLVING FOREIGN LEADERS, S. REP. NO. 94-465, at 4-6 (1975) (describing plots against Patrice Lumumba and other foreign leaders). Porup asserted that he was "appealing th[e Agency's] response because [its] reply contradict[ed] material that is already in the public record." Summ. J. Statement, Ex. 1 at 5, J.A. 26. Porup also clarified that his request "refer[red] to the CIA from its inception to [the] present day." *Id.* On September 17, 2015, the Agency stated that it had not extended Porup administrative appeal rights and declined to process his appeal.

In November 2015, Porup filed a near-duplicate FOIA request. The Agency's "final response" to that second request noted its denial of Porup's previous request. Summ. J. Statement, Ex. 1 at 12, J.A. 33. However, the CIA response did not indicate whether the Agency intended to pursue any other action. Over the ensuing year, Porup submitted several status

update requests for his most recent FOIA request, to which the Agency did not respond.

In 2017, Porup filed a complaint in the District Court alleging that the Agency had unlawfully declined to process his FOIA requests. Porup also alleged that the Agency had "a pattern or practice" of violating FOIA by "categorically refusing to process FOIA requests that seek information regarding conduct in which the CIA states it does not and cannot engage." Compl. ¶ 26, J.A. 16.

As indicated above, in the months after Porup submitted his second FOIA request, the CIA adopted a new policy for processing requests of the sort submitted by Porup. According to the CIA, under this new approach, Agency personnel were instructed not to refuse FOIA requests solely because the subject of the information sought concerns matters that are beyond the scope of the Agency's primary mission. This new policy is amplified below.

From May 2017 through April 2018, the Agency applied its new policy and produced documents that were responsive to Porup's FOIA request. In total, the Agency located 39 responsive documents in its possession. The Agency produced seven documents either redacted or in full, withheld ten in full under a combination of three exemptions to FOIA disclosure, and discovered that the other 22 documents were set to be released publicly pursuant to the President John F. Kennedy Assassination Records Collection Act of 1992, Pub. L. No. 102-526, 106 Stat. 3443 (codified at 44 U.S.C. § 2107 note). These 22 documents were later posted on the National Archives and Records Administration's website.

On April 12, 2019, the Agency moved for summary judgment. Attached to the Agency's motion were, among other things, the Declaration from Antoinette B. Shiner and a

*Vaughn* Index describing the responsive documents and explaining, where necessary, why documents were either redacted or withheld in full.

The Declaration first noted that Shiner was a "senior CIA official." Decl. ¶ 4, J.A. 40. It then described the Agency's search for responsive records:

> [P]ersonnel with expertise in conducting Agency records searches consulted with Agency officials knowledgeable about the subject matter of the requests in order to ascertain the potential universe of responsive records and to identify all of the specific offices and individuals who would likely possess those documents if they were to exist. Based on those consultations, CIA personnel determined that [two offices within the Agency] would be the offices . . . most likely [to] possess [responsive] records . . . .

> For each of the relevant electronic records systems searched, search personnel used those search terms most reasonably likely to return responsive records including: poison, covert, assassination, "Church Committee," "Rockefeller Commission," "family jewels," "ZR/RIFLE," "AMLASH," and Mongoose. Some of these terms were identified by subject matter experts as referring to operations or Congressional investigations . . . likely to be responsive to the request. . . .

> Searches were conducted in all locations in which it is reasonably likely that responsive records would reside and used search terms and methods calculated to locate those documents. Searches were reasonably calculated to uncover all records potentially

responsive to Plaintiff's FOIA request, and all files likely to contain responsive material were searched.

Decl. ¶¶ 10, 15-16, J.A. 42, 44-45.

Regarding the Agency's pattern and practice in handling FOIA requests of the sort submitted by Porup, the Declaration stated:

> It is my understanding that the CIA maintains a practice of declining to process requests for records that are well beyond the Agency's statutory and historical purview, such that it is reasonable to determine that, based on knowledge of the Agency's record systems, the Agency does not maintain records responsive to the request, and therefore cannot reasonably conduct a search for the requested records. . . . I understand that those processing determinations are made on a case-by-case basis, particular to the wording and subject matter of the request as compared against the CIA's statutory and historical purview, and the structure of the Agency's records systems. . . .
>
> [I]n the months following CIA's issuance of its initial response in this case, additional internal guidance was provided to the office responsible for processing such requests designed to clarify the circumstances under which it may be reasonable to decline to search for documents based on the nature and wording of the request . . . . Specifically, [the group responsible] has been generally instructed that the Agency should not decline to process requests solely because they pertain to activities or issues that are beyond the scope of the Agency's primary mission. Rather, processors are required to engage in a context dependent inquiry as

to whether a search may be possible, and whether the Agency's records repositories are likely to contain responsive materials. Had this additional guidance been available at the time of [Porup's] initial request, and [had] the processors . . . engaged in the appropriate, case specific analysis described above, the Agency's initial response [to Porup] would have been different. Moreover, the guidance provided mandates that this fact specific analysis will be applied to requests moving forward, and pursuant to the guidance described above, Agency personnel should not decline to process requests solely because the matters at issue are beyond the scope of the Agency's primary mission.

Decl. ¶¶ 17-18, J.A. 45-47.

The Declaration also explained why responsive documents related to Porup's FOIA request had been withheld or redacted under several exemptions to FOIA's disclosure requirements, including a statutory provision requiring the Agency to redact or withhold documents to protect intelligence sources and methods. Finally, the Declaration stated that "[i]n assessing the responsive documents, the CIA conducted a page-by-page and line-by-line review, and released all reasonably segregable, non-exempt information." Decl. ¶ 38, J.A. 60. Ms. Shiner further attested that she had "determined that no additional information may be released without divulging information that . . . falls within the scope of one or more FOIA exemptions." *Id.*

Porup opposed the motion for summary judgment on several grounds. He also filed a Notice of New Evidence, containing two FOIA response letters from the Agency authored in December 2017 and August 2018. Both response

letters, addressed to individuals other than Porup, declined to process FOIA requests because they ostensibly concerned domestic matters and "the mission of the Central Intelligence Agency is primarily concerned with foreign intelligence – not domestic – matters." Pl.'s Notice of New Evid., Ex. F. at 1, J.A. 195; *id.* at 2, J.A. 196.

On September 20, 2019, the Agency filed a supplemental memorandum in support of its summary judgment motion, attaching a supplemental declaration from Shiner (the "Supplemental Declaration" and, collectively with the Declaration, the "Shiner Declarations"). The Supplemental Declaration noted that the Agency's operational files are generally exempted from publication under FOIA. *See* 50 U.S.C. § 3141(a). However, there is a narrow exception to such nondisclosure for any operational files "concerning," among other things, "the specific subject matter of an investigation by the congressional intelligence committees . . . ." *Id.* § 3141(c)(3). Shiner thus explained that the Agency had – after Porup filed his opposition to its summary judgment motion – searched its operational files for responsive documents created on or before December 31, 1980, or roughly five years after the Church Committee had issued its interim report on alleged assassination plots. The Supplemental Declaration noted that those searches sought "to capture potentially responsive materials that would have existed at the time of the Committee's review, as well as any documents created in an attempt to address the concerns raised by the [interim] [r]eport." Def.'s Suppl. Br. in Supp. of Mot. for Summ. J., Ex. A. (hereinafter "Suppl. Decl.") ¶ 4, J.A. 220. Shiner also explained that the searches had used several search terms, including many of those listed in her original declaration, as well as "Boolean connectors." *See id.* ¶¶ 5-6, J.A. 220-21. "[A]fter a careful, line-by-line review of each document"

returned by the searches, however, the Agency had concluded that none contained responsive material. *Id.* ¶ 6, J.A. 221.

On March 16, 2020, the District Court granted the Agency's motion for summary judgment and dismissed the case. First, the District Court held, given the Declaration's sworn assertions as to the Agency's revised internal "guidance," that Porup's pattern and practice claim was moot. *See Porup v. CIA*, No. 17-cv-72 (CRC), 2020 WL 1244928, at *2-*4 (D.D.C. Mar. 16, 2020). Next, the District Court "conclude[d] that there [wa]s no genuine dispute of material fact as to whether the [A]gency's search terms were adequate," as the Shiner Declarations "provided a detailed list" of the search terms. *Id.* at *5. The court also held that the CIA was not required "to search its operational files for all information, including information on events occurring decades later, that could *hypothetically* have been deemed central to" the Church Committee's investigation into assassination plots. *Id.* at *6. Finally, the court rejected Porup's challenges to the Agency's redactions and withholdings, finding that the Declaration's justifications "easily satisf[y] the deferential standard that courts afford agency declarations relating to [the applicable FOIA exemption] in matters of national security." *Id.* at *8 (citations omitted). The District Court did not make a finding on segregability of the withheld or redacted documents.

Porup timely appealed the District Court's order.

## II. ANALYSIS

### A. Standards of Review

A trial court must grant a party's motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). This court "review[s] *de novo* a district

court's grant of summary judgment in favor of an agency which claims to have complied with FOIA." *Nation Magazine, Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 889 (D.C. Cir. 1995) (citation omitted). A grant of summary judgment on mootness grounds is also reviewed *de novo*. *See City of Hous. v. HUD*, 24 F.3d 1421, 1426 (D.C. Cir. 1994) (citation omitted).

## B. Porup's Pattern or Practice Claim Is Moot

"A lawsuit becomes moot . . . 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Almaqrami v. Pompeo*, 933 F.3d 774, 779 (D.C. Cir. 2019) (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)). In this case, it was the Agency's own action – communicating the new CIA policy described in the Declaration – that allegedly rendered the pattern or practice cause of action moot. Therefore, under the "voluntary cessation" doctrine, we may not conclude that the Agency's purported termination of the disputed practice rendered the case moot unless the CIA has demonstrated that "(1) there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely or irrevocably eradicated the effects of the alleged violation." *Zukerman v. USPS*, 961 F.3d 431, 442 (D.C. Cir. 2020) (citations and internal quotation marks omitted); *see Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) ("A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." (citation omitted)). "The burden of establishing mootness rests on the party that raises the issue," *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 459 (D.C. Cir. 1998) (citation omitted), and it "is . . . heavy," *County of Los Angeles v. Davis*, 440 U.S. 625, 631

(1979) (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953)).

The parties agree that the mootness inquiry in this case turns on whether the CIA has met its burden of demonstrating that there is no reasonable expectation that the alleged violation will recur. *See* Br. for Pl.-Appellant 19-20; Appellee's Response Br. 15. In Porup's view, the Agency failed for two reasons. First, Porup contends that the contents of the Declaration are insufficiently decisive to moot his claim. Second, Porup asserts that, under the so-called Best Evidence Rule, the District Court should not have considered the Declaration in holding that his pattern or practice claim was moot. We are not persuaded by Porup's arguments.

### 1. The Declaration Is a Decisive Statement of the Agency's New Policy

Porup is correct that the Declaration describes the CIA's new policy in terms that, at first glance, appear to vacillate between words of requirement and words that convey some degree of discretion. *Compare* Decl. ¶ 18, J.A. 47 ("[P]rocessors are *required* to engage in a context dependent inquiry . . . ." (emphasis added)), *and id.* ("[T]he guidance provided *mandates* that this fact specific analysis *will be applied* to requests moving forward . . . ." (emphases added)), *with id.* (noting that processors have been "*generally instructed* that the Agency *should not* decline to process requests solely because they pertain to activities . . . beyond the scope of the Agency's primary mission" (emphases added)), *and id.* ("Agency personnel *should not* decline to process requests solely because the matters at issue are beyond the scope of the Agency's primary mission." (emphasis added)). Viewed *in toto*, however, we agree with the District Court that the

phrasing used in the Declaration is sufficient to meet the Agency's burden.

The use of the words "required" and "mandates" in the Declaration provide strong assurance that the Agency's contested practice has been effectively vitiated. Going forward, Agency personnel must follow the new guidance put in place by CIA officials responsible for managing FOIA requests. And Porup does not contend that Ms. Shiner – the "Information Review Officer . . . for the Litigation Information Review Office," Decl. ¶ 2, J.A. 39, and a "senior CIA official," Decl. ¶ 4, J.A. 40 – lacks either the competence or authority within this sphere to effectively bind the Agency through her averments.

Moreover, government counsel represented to the court at oral argument that Agency personnel are required to adhere to the mandatory terms of the guidance:

> JUDGE: [I]s it your understanding . . . that the policy is mandatory and . . . it would have to be mandatory going forward?
>
> COUNSEL FOR THE AGENCY: Yes, Your Honor, I understand that this policy was communicated to processors as CIA's understanding of its obligations under FOIA and, as such, is mandatory on the agency by operation of statute and mandatory on CIA's employees by operation of the employer-employee relationship.

Oral Arg. Tr. 15:9-20. We may consider such representations when evaluating whether a claim is moot. *See Deakins v. Monaghan*, 484 U.S. 193, 199 n.3 (1988) (explaining that "[r]epresentations of counsel in response to inquiries at oral argument . . . persuaded" the Court that one "question

presented" was moot); *Bd. of Sch. Comm'rs of Indianapolis v. Jacobs*, 420 U.S. 128, 129 (1975) (per curiam) (finding case moot based on information provided by counsel at oral argument); *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 661 (D.C. Cir. 2019) (deciding mootness question "[b]ased on the government's submission *and representations at oral argument*" (emphasis added)).

The Declaration from the Information Review Officer of the CIA and Agency counsel's firm representations provide us with sufficient assurance that the Agency's new policy has displaced the practices contested by Porup. The Agency has assured the court that it will no longer decline FOIA requests based solely on its perception that requested records implicate activities outside the Agency's primary and legislatively authorized mission. The Agency's voluntary cessation of the challenged practices thus renders the dispute moot.

The two FOIA response letters submitted by Porup as "new evidence" do not change our view of this matter. Some "isolated mistakes by agency officials" do not, in and of themselves, demonstrate the continued existence of an illicit pattern or practice for mootness purposes. *See Payne Enters., Inc. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988). And Porup has offered nothing to show that the CIA has been following a *practice* that is at odds with the Declaration offered by Ms. Shiner. Accordingly, the December 2017 and August 2018 FOIA response letters, though perhaps fallacious in their reasoning, do not undermine our conclusion that Porup's pattern or practice claim is moot.

It is instructive to contrast the facts of this case with those found by the court in *Payne Enterprises*. In *Payne*, the court rejected an affidavit offered by the government to support its claim that the contested practice in that case had been

voluntarily terminated by the agency. The disputed affidavit did not purport to speak for the affiant's superiors in the agency, nor did it pledge future compliance by agency officials who were authorized to offer such an assurance. 837 F.2d at 492. The situation in this case is quite different. The Declaration offered by the Agency is from a "senior CIA official"; and the scope of authority of the CIA official is unchallenged.

Porup's arguments regarding the CIA's new policy focus on the meaning of the terms of the Declaration, not the authority of the source. It is also noteworthy that unlike *Payne Enterprises*, in which the government provided only "weak assurance" as to the likelihood of recurrence of the agency policies at issue in that case, *see* 837 F.2d at 492, we have no such concerns here regarding the legitimacy of the CIA's voluntary cessation of its challenged practices.

In sum, the Agency has clearly met its burden in showing that its new policy has completely eradicated the effects of the CIA practices that are the subject of Porup's complaint, and there is no reasonable expectation that the CIA's past practices will recur.

### 2. Admission of the Shiner Declaration Is Not Precluded by the "Best Evidence" Rule

Porup contends that the Declaration offered by the Agency should not be considered because it does not satisfy the requirements of the Best Evidence rule. He is mistaken.

The essence of Porup's argument is that the CIA's "failure to submit evidence of the alleged guidance beyond a declarant's cherry-picked and qualified summary is not sufficient to overcome Porup's evidence that there is a genuine issue of material fact regarding the scope and efficacy of the

alleged policy shift." Br. for Pl.-Appellant 19. Porup points to both Federal Rule of Evidence 1002 and Federal Rule of Civil Procedure 56(c)(2) to support his position. Rule 1002 states that "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." Rule 56(c)(2) states that, in a summary judgment action, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." *See Jeffries v. Barr*, 965 F.3d 843, 850 n.1 (D.C. Cir. 2020) (citing the "best evidence rule" in holding that the court could not consider a statement in litigant's declaration opposing summary judgment describing contents of separate written document); *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (holding that, in a summary judgment action, "while a [party] is not required to produce evidence in a *form* that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence"). The problem with Porup's argument is that it is based on the incorrect assumption that the Shiner Declaration emanates from a separate written guidance that the Agency was required to introduce into evidence.

The CIA offered the Declaration to explain how the Agency had changed its policy to moot Porup's pattern or practice claim. The Declaration explains, in conclusive terms, that Information Management Services personnel at the CIA were "instructed that [they] should not decline to process requests solely because they pertain to activities or issues that are beyond the scope of the Agency's primary mission." Decl. ¶ 18, J.A. 47. Porup suggests that the instructions given to CIA personnel must have come in the form of a "new policy *document*." Br. for Pl.-Appellant 20 (emphasis added). But there is absolutely nothing in the record to support this suggestion. Indeed, the Declaration's explanation of the CIA's

new policy does not reference any other document. And if Porup thought that there was such a "document," he could have pressed for discovery to review it. *See* FED. R. CIV. P. 56(d)(2). Porup has not advanced any claim with this court that he was improperly denied discovery by the District Court.

Given the record in this case, it is clear that the Declaration *is* the best evidence of the CIA's new policy. The Declaration's explanation of the new policy is a self-standing statement; and it is the only written explication of the new policy to which the Agency has subscribed. It is undisputed that the CIA followed the commands of the Declaration when it released a number of documents that were responsive to Porup's FOIA request. And the Agency has made it clear that is bound by the strictures of the Declaration going forward. So even if there was a guidance document that was a precursor to the Declaration, this would not undercut the Declaration's evidentiary significance in confirming that the Agency had adopted a new policy that effectively moots Porup's pattern and practice cause of action.

Given the circumstances surrounding the adoption of the CIA's new policy, it is hardly surprising that the District Court found that "Porup misconceives the scope of the best evidence rule." *Porup*, 2020 WL 1244928, at \*4. The District Court usefully explained that:

> "[A]n event may be proved by nondocumentary evidence, *even though a written record of it was made*." FED. R. EVID. 1002 advisory committee's note to 1972 proposed rules (emphasis added). It is only where "the event *is sought to be proved by the written record*, the rule applies." *Id.* (emphasis added). "For example," the advisory committee explained, "payment may be proved without producing the written receipt which was given." *Id*.

So too here. The existence of an agency policy may be proved by a declaration from an agency official, even if a written record of the policy exists. . . .

In any case, it is well established that summary judgment evidence need not be "in a form that would be admissible at trial," so long as it is "capable of being converted into admissible evidence." . . .

The declaration of Ms. Shiner, a veteran Information Review Officer in the Litigation Information Review Office of the CIA, attesting to the implementation of the new mandatory policy for processing of FOIA requests clears this standard. . . . Porup points to nothing in the record that would call Ms. Shiner's attestation into question.

*Porup*, 2020 WL 1244928, at *4 (citations omitted).

Porup has identified nothing within or outside the record that would cause us to doubt that the CIA's new policy is accurately reflected in the Declaration. Based on that document, Porup's pattern or practice cause of action is moot. It does not matter whether there may have been a precursor to the Declaration. The Declaration is the definitive statement of the Agency's new policy. And the facts asserted in the Declaration could have been reduced to admissible evidence, *i.e.*, Ms. Shiner could have testified to the same facts if the parties' dispute had gone beyond summary judgment. Accordingly, the District Court was permitted to consider the Declaration when evaluating the Agency's motion for summary judgment. We therefore affirm the judgment of the District Court that Porup's pattern or practice claim is moot.

### C. Porup's Challenges to the Government's Searches, Withholdings, and Redactions

"FOIA calls for broad disclosure of Government records," but Congress has "provided that agency records may be withheld from disclosure under . . . nine exemptions defined in 5 U.S.C. § 552(b)." *CIA v. Sims*, 471 U.S. 159, 166-67 (1985) (footnote omitted). One such exemption covers records that have been "specifically exempted from disclosure by [another] statute" ("Exemption 3"). 5 U.S.C. § 552(b)(3).

The Supreme Court has previously held that the National Security Act of 1947 (the "National Security Act"), "which calls for the Director of Central Intelligence to protect intelligence sources and methods, . . . qualifies as a withholding statute under Exemption 3." *Sims*, 471 U.S. at 167 (internal quotation marks omitted); *see* 50 U.S.C. § 3024(i)(1). In addition, under the Central Intelligence Agency Information Act of 1984 ("CIA Information Act"), the Agency may exempt its operational files from publication or disclosure under FOIA. *See* 50 U.S.C. § 3141(a). However, there are three exceptions to this provision of the CIA Information Act, the last of which covers

> operational files . . . concerning . . . *the specific subject matter of an investigation* by the congressional intelligence committees, the Intelligence Oversight Board, the Department of Justice, the Office of General Counsel of the Central Intelligence Agency, the Office of Inspector General of the Central Intelligence Agency, or the Office of the Director of National Intelligence *for any impropriety, or violation of law, Executive order, or Presidential directive*, in the conduct of an intelligence activity.

*Id.* § 3141(c)(3) (emphases added).

### 1. CIA Information Act Exception

Porup asserts – relying on this court's decision in *Morley v. CIA*, 508 F.3d 1108 (D.C. Cir. 2007) – that the Agency must search its operational files for responsive documents postdating December 31, 1980, or approximately five years after the Church Committee released its "Interim Report on Alleged Assassination Plots" and four years after the Committee ceased operations. The holding of *Morley*, however, is not as broad as Porup argues.

In *Morley*, the FOIA plaintiff sought documents pertaining to "the CIA case officer for the anti-Castro organization known as the *Directorio Revolucionario Estudantil* ("DRE") in 1963." *Id.* at 1113. "[T]he DRE had contact with Lee Harvey Oswald in the months before President Kennedy's assassination," *id.*, and "the scope of the Church Committee investigation specifically encompassed operations of the CIA and other federal agencies in investigating the assassination," *id.* at 1117 (citation omitted). *See also id.* ("Significantly, the Church Committee found that the CIA inquiry was deficient on the *specific* question of the significance of Oswald's contacts with pro- and anti-Castro groups for the many months before the assassination." (emphasis added) (alteration, citation, and internal quotation marks omitted)). In interpreting the scope of the § 3141(c)(3) exception, the court stated "that a FOIA request concern[s] 'the specific subject matter of an investigation' . . . where the investigating committee *would have deemed the records at issue to be central to its inquiry*." *Id.* at 1118 (emphasis added).

Porup argues that *any* operational files relating to covert assassination attempts, even if generated well after the Church Committee had ceased to operate, would satisfy the *Morley*

standard. However, *Morley* presented an easily distinguishable factual scenario, as it concerned documents "surrounding a particular event" that had been thoroughly investigated by the Church Committee, *i.e.*, President Kennedy's assassination and the CIA's conduct leading up to it. *See id.* at 1117-18. Thus, the *Morley* court's holding concerned already-existing records that the Church Committee would have deemed central to its inquiry had it known about them at the time of its investigation.

By contrast, Porup invokes a much broader claim that an investigating committee would deem records central to its inquiry *even if they did not yet exist*. It does not appear that the *Morley* court intended for its holding on this issue to be so general and all-encompassing as Porup asserts, given the court's ensuing discussion of the material facts on the issue. *See id.* at 1118 ("The Church Committee *posed a targeted inquiry* investigating the performance of the intelligence agencies *surrounding a particular event*. The role of individual CIA officers *during this event* was key to such an inquiry, information that the committee would have sought out rather than merely happened upon. . . . [T]he focus of the committee's investigation was the relationship between organizations like the DRE and the Kennedy assassination. The evidence proffered by [the plaintiff] indicates that [the CIA case officer] was in a position of central importance to such an investigation and was thus covered by its 'specific subject matter.'" (emphasis added) (citation omitted)).

Furthermore, Porup's proposed approach would render the word "specific" in the statutory text largely nugatory, a result to be avoided. *See Del. Dep't of Nat. Res. & Env't Control v. EPA*, 895 F.3d 90, 99 (D.C. Cir. 2018) ("[W]e strive to construe [a] statute[] 'so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" (quoting *Corley v. United States*, 556 U.S. 303,

314 (2009))). And Porup cites no authority or support for his position other than a single sentence in *Morley*. We therefore reject his reading of the statute and agree with the District Court that the Agency sufficiently searched its operational files in response to Porup's request.

### 2. Other Grounds Raised by Porup in Challenging the Agency's Searches

Porup next contends that summary judgment was premature because the Agency "fail[ed] to state that it [searched for] the names of . . . unrevealed programs." Br. for Pl.-Appellant 22; *see id.* at 21-22. Similarly, Porup asserts that the Shiner Declarations did not demonstrate that the Agency considered whether investigative bodies referenced in 50 U.S.C. § 3141(c)(3), in addition to the Church Committee, conducted nonpublic investigations into covert assassination plots. *See id.* at 10-13. And he argues that the Shiner Declarations did not sufficiently describe how the Agency conducted its searches, particularly regarding the use of Boolean connectors. *See id.* at 13-14. However, Porup has not demonstrated a genuine dispute of material fact on these issues.

"[A]n agency responding to a FOIA request is simply required to conduct a search *reasonably calculated* to uncover all *relevant documents*." *In re: Clinton*, 973 F.3d 106, 116 (D.C. Cir. 2020) (alteration, citation, and internal quotation marks omitted). "[I]n response to a challenge to the adequacy of its search for requested records[,] [an] agency may meet its burden by providing 'a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials . . . were searched.'" *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 313-14 (D.C. Cir. 2003) (fourth alteration in original) (quoting *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999)). "Agency affidavits are accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981) (per curiam)).

The Shiner Declarations listed several of the search terms that were used by the Agency. In addition, the declarations explained that subject matter experts worked to determine these and other search terms, as well as the locations to be searched. The Supplemental Declaration explained that the searches "used Boolean connectors to create logical search queries." Suppl. Decl. ¶ 6, J.A. 221. And the Declaration averred that the Agency's searches were "reasonably calculated" to identify all responsive records, and that "all files likely to contain responsive material were searched." Decl. ¶ 16, J.A. 45. Those sworn assertions were sufficient to carry the Agency's burden as to its search terms and methodology.

Porup also suggests that the Agency may not have run searches for covert assassination programs that have not yet been publicly disclosed and may have neglected to consider nonpublic investigations by bodies other than the Church Committee, because "[t]he records being requested in this case have the potential to be extremely sensitive and potentially embarrassing to the agency." Br. for Pl.-Appellant 22. However, he offers no evidence that such concerns caused the Agency to decline to search for, or otherwise suppress disclosure of, responsive records. This "pure[] speculati[on]" is not sufficient to create a genuine dispute of material fact on these issues. *See SafeCard Servs.*, 926 F.2d at 1200 (citation omitted).

### 3. Challenges to the Agency's Withholdings and Redactions

Porup argues that the District Court misconceived the documents for which he challenged withholdings and redactions made by the Agency pursuant to Exemption 3 and the National Security Act. As the Agency conceded during oral argument, this may well be true. However, Porup has not explained why the *number* of documents at issue undermines a finding that the broadly applicable information contained in the Shiner Declarations carried the Agency's burden on this point. The Agency explained in the Declaration why it had redacted and withheld documents pursuant to Exemption 3 and the National Security Act, focusing on the harm that might result from disclosure. *See* Decl. ¶ 33, J.A. 57-58 (asserting "that disclosure of [such] information would expose CIA officers and highlight capabilities and limitations of intelligence activities of the Agency, which could render them ineffective," and might "reveal sensitive security requirements, potentially putting Agency officers at risk"). Exercising *de novo* review, we find that the Agency's representations are sufficient to carry

its burden, regardless of whether they cover more documents than the District Court realized. *See Wolf v. CIA*, 473 F.3d 370, 377 (D.C. Cir. 2007) (noting that courts must "give[] . . . great[] deference to CIA assertions of harm to intelligence sources and methods under the National Security Act" (citation omitted)).

Moreover, Porup has explicitly declined to raise his "substantive arguments about specific withholdings" before this court "in the interest of judicial economy." Br. for Pl.-Appellant 17 n.8. While he still maintains in a footnote that summary judgment was incorrect as to all of the Agency's Exemption 3 withholdings pursuant to the National Security Act, *see id.*, his conclusory arguments are "insufficiently developed to constitute a serious challenge to the district court's" findings. *See Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1241 (D.C. Cir. 2004); *see also CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) ("A footnote is no place to make a substantive legal argument on appeal; hiding an argument there and then articulating it in only a conclusory fashion results in forfeiture."). Thus, we decline to address them.

### D. Segregability

Finally, Porup asserts that the case must be remanded for the District Court to make a segregability finding. "FOIA provides that '[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt.'" *Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020) (alteration in original) (quoting 5 U.S.C. § 552(b)). We have held that a trial court must make a segregability finding if a federal agency has redacted or withheld documents pursuant to FOIA exemptions. *See, e.g.*, *Sussman v. U.S. Marshals Serv.*,

494 F.3d 1106, 1116 (D.C. Cir. 2007); *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999). And in at least one case, a panel of the court stated that "[i]f the district court approves withholding without such a finding, remand is required even if the requester did not raise the issue of segregability before the [district] court." *Sussman*, 494 F.3d at 1116 (citations omitted).

However, other panels of this court have made segregability findings in the first instance, instead of "remanding . . . *solely* for th[e] purpose" of such findings. *Juarez v. DOJ*, 518 F.3d 54, 60 (D.C. Cir. 2008) (emphasis added); *see Machado Amadis*, 971 F.3d at 371. Because "our review of summary judgment is *de novo*[,] . . . we have the same record before us as did the district court [and] we are just as capable of evaluating the [CIA]'s [declarations] regarding segregability as is the court below." *Juarez*, 518 F.3d at 60. Thus, rather than remanding solely for the District Court to pass upon segregability, we will exercise our discretion to make such a determination in the first instance.

Based on the Shiner Declarations, the Agency has carried its burden in demonstrating that it released all segregable portions of the responsive documents. Ms. Shiner attested that the Agency had "conducted a page-by-page and line-by-line review, and released all reasonably segregable, non-exempt information" within responsive records. Decl. ¶ 38, J.A. 60. Moreover, Ms. Shiner "determined that no additional information may be released without divulging information that . . . falls within the scope of one or more FOIA exemptions." *Id.* Those sworn statements sufficiently establish that "no portions of the withheld documents may be segregated and released." *Juarez*, 518 F.3d at 61; *see also Machado Amadis*, 971 F.3d at 371-72 (noting that government agency's "line-by-line review" of documents in responding to FOIA

request was sufficient as to segregability responsibilities). Accordingly, we find that the Agency has met its segregability obligations.

### III. Conclusion

For the foregoing reasons, we affirm the judgment of the District Court.