# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 22, 2024         Decided July 9, 2024

No. 22-7150

SAAD ALJABRI, DR.,
APPELLANT

v.

MOHAMMED BIN SALMAN BIN ABDULAZIZ AL SAUD, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-02146)

*Lindsay Harrison* argued the cause for appellant. With her on the briefs were *Jason P. Hipp* and *Andrianna Kastanek*.

*Michael K. Kellogg* argued the cause for appellees. With him on the brief were *William W. Taylor, III*, *Margarita K. O'Donnell*, *Gregory G. Rapawy*, *Barry J. Pollack*, *Jessica N. Carmichael*, *Mitchell R. Berger*, *Benjamin D. Wood*, and *Alexandra E. Chopin*.

Before: RAO and CHILDS, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

2

Opinion for the Court filed by *Circuit Judge* CHILDS.

CHILDS, *Circuit Judge*: Appellant Dr. Saad Aljabri ("Plaintiff") served in the government of Saudi Arabia for thirty-nine years primarily as an expert in national security and counterterrorism. Because of his close contacts with U.S. intelligence officials and his role as a trusted advisor to former Saudi Crown Prince and Minister of the Interior Mohammed bin Nayef ("bin Nayef"), Plaintiff alleges that a group of individuals led by current Saudi Prime Minister and Crown Prince Mohammed bin Salman bin Abdulaziz al Saud ("bin Salman") plotted to kill Plaintiff after he relocated to Canada. In response to various motions to dismiss Plaintiff's claims, the district court found that it lacked personal jurisdiction over most of the defendants, and Plaintiff had failed to state a claim against two others, Mohammed Alhamed and Layla Abuljadayel (together the "U.S.-based students").[1] *Aljabri v. al Saud*, Civ. A. No. 20-2146, 2022 WL 4598519, at *17–19 (D.D.C. Sept. 30, 2022). Plaintiff appeals. Upon *de novo* review, we affirm dismissal of the claims against bin Salman and the U.S.-based students; vacate the district court's dismissal of claims against Bader Alasaker and Saud Alqahtani (together the "top aides"); and remand for jurisdictional discovery.

**I.**

As alleged in his amended complaint, Plaintiff began working for the Saudi government in 1976, rising to become a senior official of the Saudi Ministry of Interior and an advisor

---

[1] In a separate order, the district court dismissed Bijad Alharbi for Plaintiff's failure to timely effect service under Federal Rule of Civil Procedure 4(m).

to bin Nayef.[2]  After the 9/11 terrorist attacks, Plaintiff helped Saudi Arabia become a key counterterrorism partner to the United States while developing close cooperative relationships with U.S. intelligence officials.  In 2015, Plaintiff was terminated from his government position partly due to this relationship.

The Crown Prince of Saudi Arabia is first in the line of succession to replace the king.  On June 20, 2017, bin Salman usurped the position of Crown Prince of Saudi Arabia from bin Nayef, who was placed under house arrest.  Bin Salman believed he needed the support of the United States to ascend to the Saudi throne and bin Nayef was an impediment to that happening based on his relationships with U.S. officials.

During the month preceding this change in the Saudi power structure, Plaintiff became concerned for his well-being because of his relationships with bin Nayef and the U.S. intelligence community, and prior conflicts with bin Salman. So, on May 17, 2017, Plaintiff fled from Saudi Arabia to Turkey.  Upon learning about Plaintiff's departure from the country, bin Salman used various measures to lure Plaintiff back to Saudi Arabia.  These efforts included sending text messages demanding Plaintiff's return, prohibiting his son and daughter from leaving the country to attend school, ending another son's scholarship payments, initiating a Red Notice request with INTERPOL for Plaintiff's arrest, and other threatening behavior.  When Plaintiff learned bin Salman was pressuring Turkey to return him to Saudi Arabia, Plaintiff fled to Toronto, Canada, on September 12, 2017, but Plaintiff told bin Salman he was traveling to Boston, Massachusetts.

---

[2] At the pleading stage, we accept all facts stated in the applicable amended complaint as true. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

When Plaintiff did not return to Saudi Arabia, bin Salman set out to find him. Bin Salman activated a network of Saudi students in the United States through bin Salman's self-funded Prince Mohammed bin Salman bin Abdulaziz Foundation ("MiSK"). Importantly, Alasaker was the executive director of MiSK and Saud Alqahtani was a member of MiSK's board of directors.[3] The top aides used MiSK to cultivate a network of Saudi students in the United States by coordinating with student clubs and hosting leadership events and/or cultural programs. Plaintiff claimed that the top aides used MiSK to recruit spies from its student clubs. Bin Salman and Alasaker activated three student spies, Youssef Alrajhi, and the U.S.-based students, to find Plaintiff. These students allegedly gained information regarding Plaintiff's location by speaking with his family living in the United States.

By December 2017, bin Salman knew Plaintiff was in Canada. Bijad Alharbi, an acquaintance of Plaintiff through their connection to bin Nayef, traveled to Toronto to persuade Plaintiff to return to Turkey, where he would be less lonely and could visit his family.

Almost a year later, on October 15, 2018, bin Salman devised a plan to kill Plaintiff because he refused to return to Saudi Arabia. Bin Salman activated the "Tiger Squad," a private death squad made up of about fifty intelligence, military, and forensic operatives from different branches of the

---

[3] Plaintiff identified Bader Alasaker as "one of . . . bin Salman's closest aides" and said Alasaker "is known as . . . bin Salman's 'invisible hand.'" Amend. Compl. ¶ 40 (JA.45) (note omitted). Plaintiff called Saud Alqahtani bin Salman's "top aide," "chief propagandist," "one of his chief enforcers," and "right-hand man." Amend. Compl. ¶¶ 48, 49 (JA.50), 55 (JA.53).

Saudi government.[4]  The Tiger Squad first tried to enter Canada individually, acting as tourists, but were stopped when customs found forensic tools in their luggage and group photos proving that the individuals knew each other.  Ultimately, only one member could enter Canada, thereby foiling the plot.

Bin Salman did not give up.  In May 2020, he obtained a fatwa—a ruling by religious authorities—endorsing the killing of Plaintiff.  To execute the fatwa, bin Salman planned to send agents by land through the United States to Canada.  In fact, a Canadian security agency warned Plaintiff about credible and imminent threats to his life that same year.  Canadian Law Enforcement considered the threat so concrete that an "Emergency Response Team" was stationed outside Plaintiff's house, and he was instructed to cancel all  meetings.    Other sources also warned Plaintiff of credible attempts on his life and the continued existence of a high level of threat.

After surviving the failed attempts on his life, Plaintiff filed a complaint on August 6, 2020, against bin Salman, other Saudi officials, several U.S.-based individuals, MiSK, both known Tiger Squad members, and eleven unknown John Doe members of the Tiger Squad.  He alleged claims for: (1) attempted extrajudicial killing in violation of the Torture Victim Protection Act, 28 U.S.C. § 1350 note, (2) conspiracy to commit an extrajudicial killing, which constitutes a tort committed in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, and (3) a claim for intentional infliction of emotional distress.  After bin Salman, Alrajhi, Alhamed, Abuljadayel, Saud Alqahtani, Ahmed Alassiri, Mishal Fahad Alsayed, Khalid Ibrahim Abdulaziz Algasem,

---

[4] For further descriptive context, Plaintiff asserts that the members of the Tiger Squad carried out the infamous 2018 assassination of Saudi journalist Jamal Khashoggi at the Saudi consulate in Istanbul, Turkey.

Saud Abdulaziz Alsaleh, Bandar Saeed Alhaqbani, Ibrahim Hamad Abdulrahman Alhomid, Alasaker, and MiSK moved to dismiss the complaint, Plaintiff filed an amended complaint on February 4, 2021, to supplement his allegations. Bin Salman, Alrajhi, Alhamed, Abuljadayel, Hani Fakri Hamed, Saud Alqahtani, Alassiri, Alsayed, Algasem, Alsaleh, Alhaqbani, Alhomid, Ahmed Abdullah Fahad Albawardi, Bader Mueedh Saif Alqahtani, Alasaker, and MiSK then moved to dismiss the amended complaint.

On September 30, 2022, the district court dismissed (1) the claims against bin Salman, Alasaker, Saud Alqahtani, Alassiri, MiSK, Alrajhi, Hamed, Alsaleh, Alsayed, Algasem, Alhaqbani, Alhomid, Albawardi, and Bader Alqahtani for lack of personal jurisdiction; and (2) the claims against the U.S.-based students for failure to state a claim. In reaching this determination, the district court was unpersuaded by Plaintiff's allegations that bin Salman purposefully targeted the United States by plotting to kill Plaintiff and thereby harming U.S. intelligence interests, or, through the actions of third parties, "directed an agent of his to look for [Plaintiff] in the United States." *Aljabri*, 2022 WL 4598519, at *8. However, even if Plaintiff could "aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction over" bin Salman, *id.* (citation omitted), the district court found that due to the burden on bin Salman to litigate in the United States and Saudi Arabia's greater procedural and substantive interest, the court's exercise of personal jurisdiction over bin Salman would not meet "traditional notions of fair play and substantial justice." *Id.* at *13 (quoting *Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano Cty.*, 480 U.S. 102, 105 (1987)). As to Alasaker, Saud Alqahtani, Alassiri, and the members of the Tiger Squad, the district court reiterated that their involvement in a plot to kill Plaintiff did not target the United States. Moreover, none of their contacts

related to the lawsuit, and the court's exercise of jurisdiction over them would not comport with "traditional notions of fair play and substantial justice." *Id.* at \*14 (quoting *Asahi*, 480 U.S. at 105). In the same vein, the district court also determined that the District of Columbia's long-arm statute did not provide "specific" personal jurisdiction over MiSK, Alrajhi, or Hamed because Plaintiff failed to sufficiently align their alleged business activities in D.C. with the plot against his life. *Id.* at \*15–16.

Next, the district court addressed Plaintiff's assertion that dismissal should not occur without jurisdictional discovery. Specifically, Plaintiff requested discovery on communications between and among bin Salman, Alasaker, Saud Alqahtani, Alassiri, MiSK, the Tiger Squad, and other individuals based in the United States; information regarding the Tiger Squad's travel in the United States; a list of contacts for MiSK, Alrajhi, and Hamed; and details regarding bin Salman's May 2020 directive to his agents to kill Plaintiff. The district court denied Plaintiff's request for jurisdictional discovery on the basis that any information revealed in the discovery would not change the court's conclusion that exercising personal jurisdiction over bin Salman, Alasaker, Saud Alqahtani, Alassiri, and the Tiger Squad defendants would be unreasonable. The district court further found that Plaintiff's requests were "overly broad," conjectural, speculative, and burdensome to the court. *Id.* at \*17 (citation omitted).

Finally, the district court concluded that despite the failure of the U.S.-based students to raise an objection to personal jurisdiction, thereby waiving that defense, Plaintiff did not adequately allege any claim against either individual. *Id.* at \*18. The district court observed that the claims against the U.S.-based students "hinge[d] on a theory of secondary liability—that is, that Alhamed and Abuljadayel are liable

because they conspired and aided and abetted bin Salman's plot to kill [Plaintiff]." *Id.* In this regard, dismissal was appropriate because the amended complaint's allegations did "not allow the Court to infer that either Alhamed or Abuljadayel had any relationship with bin Salman, much less that they *knew* that their alleged conduct was supposedly assisting a plot by bin Salman to kill a former Saudi official." *Id.* at *19. Simply put, the alleged facts did not show that the U.S.-based students knew of a plot to kill Plaintiff.

Plaintiff timely appealed the district court's decision.

## II.

We have appellate jurisdiction under 28 U.S.C. § 1291. We review the district court's dismissal for lack of personal jurisdiction and failure to state a claim *de novo*, accepting as true Plaintiff's factual allegations and drawing all reasonable inferences in his favor. *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 43 (D.C. Cir. 2020); *Moore v. Valder*, 65 F.3d 189, 192 (D.C. Cir. 1995); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In addition, we review the district court's denial of jurisdictional discovery for abuse of discretion. *Lewis v. Mutond*, 62 F.4th 587, 590 (D.C. Cir. 2023).

## A.

We turn first to a contention by bin Salman that notwithstanding the district court's personal jurisdiction decision, he is now entitled to absolute head of state immunity after his elevation to the position of Prime Minister of Saudi Arabia on September 27, 2022.[5]

---

[5] Although the district court issued its opinion three days after bin Salman's appointment to Prime Minister, the court was not made aware of that occurrence by the parties. *See* Appellees' Br. 18.

Head of state immunity is an extension of the common law doctrine of foreign sovereign immunity. *See, e.g.*, *Manoharan v. Rajapaksa*, 711 F.3d 178, 179 (D.C. Cir. 2013). "[C]ommon law foreign immunity distinguishes between two types of immunity: status-based and conduct-based immunity." *Lewis v. Mutond*, 918 F.3d 142, 145 (D.C. Cir. 2019). "Status-based immunity is reserved for diplomats and heads of state and attaches 'regardless of the substance of the claim.'" *Id.* (citation omitted). "[T]he rationale of head-of-state immunity is to promote comity among nations by ensuring that leaders can perform their duties without being subject to detention, arrest or embarrassment in a foreign country's legal system." *Yousuf v. Samantar*, 699 F.3d 763, 769 (4th Cir. 2012) (citation omitted). "A head-of-state recognized by the United States government is absolutely immune from personal jurisdiction in

---

Accordingly, the district court did not address the head of state immunity issue. In the D.C. Circuit, "it is the general rule that a federal appellate court does not consider an issue not passed upon below," but "the matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 697 (D.C. Cir. 1991) (cleaned up). "We have stated that in exercising this discretion we will look to factors such as whether the issue in question has been fully briefed by the parties and whether decision of the issue would be aided by the development of a factual record in the district court." *Id.* Based on our review of the briefing and the current factual record, we exercise our discretion to consider head of state immunity during this appeal. *See Porup v. CIA*, 997 F.3d 1224, 1238–39 (D.C. Cir. 2021) ("Because 'our review . . . is *de novo*[,] . . . we have the same record before us as did the district court [and] we are just as capable of evaluating the [CIA]'s [declarations] . . . as is the court below.' Thus, rather than remanding solely for the District Court to pass upon segregability, we will exercise our discretion to make such a determination in the first instance." (alterations in original) (internal citations omitted)).

United States courts unless that immunity has been waived by statute or by the foreign government recognized by the United States." *Id.* (citation omitted).

"Conduct-based immunity is afforded to 'any public minister, official, or agent of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state.'" *Lewis*, 918 F.3d at 145 (cleaned up). "With respect to conduct-based immunity, foreign officials are immune from 'claims arising out of their official acts while in office.'" *Yousuf*, 699 F.3d at 774 (citations omitted). "This type of immunity stands on the foreign official's actions, not his or her status, and therefore applies whether the individual is currently a government official or not." *Id.*

To determine whether a foreign official is entitled to immunity, we conduct a two-part test. *Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789, 798 (D.C. Cir. 2021). First, we assess whether the U.S. State Department has filed a suggestion of immunity in the case. *Samantar v. Yousuf*, 560 U.S. 305, 311 (2010). If the Executive Branch has spoken, we defer to its determination, and we lack jurisdiction over the defendant. *Id.* If the Executive Branch has not weighed in, we independently assess whether "all the requisites for such immunity exist[]." *Id.* (citation omitted). Out of respect for the Executive Branch's constitutional role in foreign relations, however, our review relies heavily on State Department "policy and practice," as shown in "suggestions of immunity and statements of interest in other cases." *Broidy*, 12 F.4th at 798. If we find the Executive Branch's policies favor giving that individual head of state status, we again lack jurisdiction. *Samantar*, 560 U.S. at 312.

Here, pertinent to our analysis, Saudi Arabia, through its embassy, requested a suggestion of immunity from the U.S. State Department on October 8, 2020. The record does not indicate that the State Department has responded to this request for a suggestion of immunity. However, the State Department filed a suggestion of immunity regarding bin Salman in *Cengiz v. bin Salman*, Civ. A. No. 20-03009, ECF No. 53 (D.D.C. Nov. 17, 2022), which states in relevant part that "Mohammed bin Salman, the Prime Minister of the Kingdom of Saudi Arabia, is the sitting head of government and, accordingly, is immune from . . . suit." JA.342. The *Cengiz* suggestion of immunity further states, "bin Salman possesses immunity from . . . suit as the Prime Minister of the Kingdom of Saudi Arabia while he holds that office." JA.343 ¶ 1. Furthermore, "this determination is controlling and is not subject to judicial review." *Id.* Because the *Cengiz* suggestion of immunity is filed in a different case, it is not enough to satisfy the first step of the *Samantar* analysis—and obviously, no suggestion has been filed here. However, we place great weight on the *Cengiz* suggestion in our analysis of the second step of the foreign immunity test. *See Muzin*, 12 F.4th at 798. To this point, bin Salman still holds the office of Prime Minister—and Plaintiff has not meaningfully suggested that bin Salman's status has changed since the *Cengiz* statement—thus, we will follow the State Department's prior suggestion of immunity and affirm the district court's dismissal of Plaintiff's claims against bin Salman.

**B**.

We next turn to Plaintiff's argument that he was entitled to jurisdictional discovery to supplement his allegations. The federal courts "are courts of limited jurisdiction" and cannot hear cases without, among other things, personal jurisdiction over the parties. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Generally, to have personal

jurisdiction over a defendant, the Fifth Amendment requires that defendant have "minimum contacts" with the United States that satisfy "traditional notions of fair play and substantial justice." *Livnat v. Palestinian Auth.*, 851 F.3d 45, 48, 54 (D.C. Cir. 2017) (cleaned up). However, it is not always easy for a plaintiff to show a defendant's minimum contacts in a complaint.

The Supreme Court has held that "where issues arise as to jurisdiction . . . , discovery is available to ascertain the facts bearing on such issues." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978). In this regard, if allowed jurisdictional discovery, plaintiffs facing motions to dismiss for lack of personal jurisdiction can potentially uncover revealing information they would not have known otherwise. *See Urquhart-Bradley*, 964 F.3d at 48–49. Moreover, the burden to demonstrate entitlement to jurisdictional discovery is not onerous, only requiring that a plaintiff "have at least a good faith belief that such [jurisdictional] discovery will enable it to show that the court has personal jurisdiction over the defendant." *Williams v. Romarm, SA*, 756 F.3d 777, 786 (D.C. Cir. 2014) (citation omitted).

Here, the district court abused its discretion in not allowing jurisdictional discovery on the record before it. Plaintiff alleged a good-faith belief that communications between Alasaker, Saud Alqahtani, and the U.S.-based Saudis could establish the minimum contacts necessary to exercise personal jurisdiction over him. JA.330. That said, we acknowledge that the district court was properly cautious when considering Plaintiff's jurisdictional discovery requests "in light of other factors" bearing on "fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (citation omitted). Nevertheless, while the district court properly denied most of his requests, it abused its discretion in finding

Plaintiff's claims regarding the communications between Alasaker, Saud Alqahtani, and the other U.S.-based Saudis were clearly frivolous. *See FC Inv. Grp. LC v. IFX Mkts.*, 529 F.3d 1087, 1094 (D.C. Cir. 2008) ("[A] request for jurisdictional discovery cannot be based on mere conjecture or speculation."). Within the 179 pages and 414 paragraphs of his amended complaint, Plaintiff set forth allegations of his death being the object of a broad conspiracy involving Saud Alqahtani, Alasaker, and the U.S.-based Saudis. Evidence of an agreement between those defendants could both establish minimum contacts with the United States and affect the fairness of exercising personal jurisdiction over Saud Alqahtani and Alasaker. *See Burger King*, 471 U.S. at 476. Therefore, the district court abused its discretion in denying Plaintiff the opportunity to conduct jurisdictional discovery regarding the communications between these individuals.

*****

Accordingly, we affirm the district court's dismissal of all claims against Saudi Prime Minister Mohammed bin Salman bin Abdulaziz al Saud, albeit for a different reason: his immunity from suit. *See Parsi v. Daioleslam*, 778 F.3d 116, 126 (D.C. Cir. 2015) ("Ordinarily, a court of appeals can affirm a district court judgment on any basis supported by the record, even if different from the grounds the district court cited."). However, we hold that the district court did abuse its discretion in denying Plaintiff's motion for jurisdictional discovery outright. We therefore reverse the district court's order denying jurisdictional discovery, vacate the judgment of dismissal with respect to Bader Alasaker and Saud Alqahtani, and remand for jurisdictional discovery described above. The district court may exercise its broad discretion to control the scope of discovery and the burden on high-ranking Saudi officials. We express no opinion on the other jurisdictional

issues, and we affirm the dismissal of claims against Mohammed Alhamed and Layla Abuljadayel for the reasons given by the district court, *supra* at 7–8.  Still, the jurisdictional discovery may reveal facts which could cure the defect in the claims against Alhamed and Abuljadayel.  Thus, we remand with instructions to dismiss those claims without prejudice to refiling by Plaintiff.

*So ordered*.