# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 17, 2016          Decided April 22, 2016

No. 15-5065

VICTOR K. WILLIAMS,
APPELLANT

v.

JACOB J. LEW, IN HIS OFFICIAL CAPACITY AS SECRETARY OF
THE U.S. TREASURY DEPARTMENT AND UNITED STATES
DEPARTMENT OF THE TREASURY,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-00183)

———

*Justin G. Florence* argued the cause for appellant. On the briefs was *Victor Williams*, pro se. *Douglas Hallward-Driemeier*, *Edward F. Roche*, and *Jonathan Ference-Burke* entered appearances.

*Molly R. Silfen*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, and *Mark B. Stern*, Attorney.

Before: TATEL and GRIFFITH, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*: Appellant Victor Williams, as a holder of U.S. public debt, challenges the constitutionality of the Debt Limit Statute, 31 U.S.C. § 3101. Williams alleges on appeal violations of the Fourteenth Amendment Public Debt Clause, U.S. Const. amend. XIV, § 4, and the Fifth Amendment Due Process Clause, U.S. Const. amend. V. He seeks relief declaring the Debt Limit Statute unconstitutional and enjoining the Secretary from enforcing the statute. Because Williams fails to allege plausible factual allegations to establish the constitutional minimum requirements for Article III standing, either in the first amended complaint filed with the district court or in his proposed amended complaint filed with this Court under 28 U.S.C. § 1653, we affirm the decision of the district court dismissing Williams's claims for lack of standing. We also affirm the district court's order denying Williams's motion to amend his first amended complaint and deny Williams's motion to amend his complaint on appeal.

## I. BACKGROUND

This case is an outgrowth of the continuing debate surrounding the statutory limit on U.S. debt. The Debt Limit Statute, 31 U.S.C. § 3101(b), imposes an upper limit on "[t]he face amount of obligations issued under this chapter and the face amount of obligations whose principal and interest are guaranteed by the United States Government." The United States first instituted a ceiling on the federal debt in 1917 to accompany the United States' entrance into World War I. *See*

D. Andrew Austin, Cong. Research Serv., *The Debt Limit: History and Recent Increases* 2-3 (2008), http://fpc.state.gov/ documents/organization/105193.pdf; *see also* Act of Sept. 24, 1917, Pub. L. No. 65-43, 40 Stat. 288 (codified as amended at 31 U.S.C. § 3101). The original purpose of the Debt Limit Statute was to increase the Treasury Department's flexibility to manage the government's financial obligations. *See* Austin, *supra*, at 3; *see also* Josh Hazan, *Unconstitutional Debt Ceilings*, 103 Geo. L.J. Online 29, 30-32 (2014). Yet both in 2011 and in 2013, congressional budgeting disputes threatened default on U.S. obligations as outstanding debt broached the debt ceiling. *See* Hazan, *supra*, at 29-30. Following the 2011 impasse, "U.S. government debt was downgraded, the stock market fell, measures of volatility jumped, and credit risk spreads widened noticeably . . . ." U.S. Dep't of the Treasury, *The Potential Macroeconomic Effect of Debt Ceiling Brinksmanship* 1 (2013), https:// www.treasury.gov/connect/blog/Pages/Report-on-Macroeconomic-Effect-of-Debt-Ceiling-Brinkmanship.aspx. Likewise, the 2013 dispute "further eroded confidence in the United States government, and wounded the already fragile economy." Chad DeVeaux, *The Fourth Zone of Presidential Power: Analyzing the Debt-Ceiling Standoffs Through the Prism of Youngstown Steel*, 47 Conn. L. Rev. 395, 407 (2014). In the wake of these political impasses, Congress presently has suspended the Debt Limit Statute through March 15, 2017. *See* Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 901(a), 129 Stat. 584, 620.

Williams holds various Treasury-issued public debt instruments, including "savings bonds and Treasury bills, notes, bonds, and TIPS [Treasury Inflation Indexed Securities] of various durations (4-weeks, 13-weeks, 26-weeks, 52-week[s], 3-years, 5-years, 7-years, [and] 30-years)." J.A. 20 ¶ 39. Seeking a judicial solution to what he

views as the perpetual "political conflict regarding the inevitable need to raise the debt limit," J.A. 6 ¶ 2, on February 7, 2014, Williams filed suit, challenging the constitutionality of the Debt Limit Statute, against the U.S. Department of the Treasury and the Secretary of the U.S. Treasury (collectively, the "Treasury Department"). Before the Treasury Department lodged a responsive pleading or Rule 12(b) motion, Williams filed a first amended complaint as-of-right on March 5, 2014. *Cf.* Fed. R. Civ. P. 15(a)(1). The first amended complaint sought a judgment declaring the Debt Limit Statute unconstitutional and a permanent injunction prohibiting the Treasury Department from "relying upon, invoking, or enforcing" the statute. J.A. 34.

Williams asserted three alleged constitutional infirmities in the Debt Limit Statute before the district court. First, he claimed that the statute violates the Public Debt Clause, U.S. Const. amend. XIV, § 4, which states, in relevant part:

> The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned.

*See* J.A. 21 ¶ 42(A); *see also* Amended Complaint Filed on Appeal Pursuant to 28 U.S.C. 1653 ¶¶ 65(A), 66, *Williams v. Lew*, No. 15-5065 (D.C. Cir. May 14, 2015) [hereinafter Pr. Am. Compl.]. Second, Williams alleged a violation of the Fifth Amendment's Due Process Clause based on the Treasury Department's "arbitrary enforcement" of the Debt Limit Statute. J.A. 21 ¶ 42(A); *see also* Pr. Am. Compl. ¶¶ 65(A), 66. Finally, Williams made a separation-of-powers

argument that the Debt Limit Statute "prevent[s] the Executive from carrying out sworn Article II § 3 duties to 'take Care that the Laws be faithfully executed.'" J.A. 21 ¶ 42(B); *see also* Pr. Am. Compl. ¶ 65(B).

The Treasury Department moved to dismiss Williams's first amended complaint under Rule 12(b)(1) for lack of standing. Williams then moved under Rule 15(a)(2) for leave to file a second amended complaint, in part "to clarify his claims [and to] further explain and develop the basis for his standing . . . ." J.A. 96. The district court denied Williams's motion to amend without explanation via minute order on May 18, 2014. On January 6, 2015, the district court granted the Treasury Department's motion to dismiss, concluding that Williams lacked standing to pursue his claims in federal court. Williams now appeals from the district court's denial of his motion to amend and from the order dismissing his claims for lack of standing. Williams also moves this Court for leave to amend his complaint under 28 U.S.C. § 1653. Request To Allow Filing of an Amended Complaint & Alternative Motion To Vacate, Reverse, & Remand, *Williams v. Lew*, No. 15-5065 (D.C. Cir. May 1, 2015). We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II. ANALYSIS

Williams makes only a fleeting reference in his opening brief, within a section ostensibly discussing his Public Debt Clause claim, to his separation-of-powers argument. Appellant's Br. 15-16 (stating that the debt limit "traps the Executive in an arbitrary 'trilemna' [sic] . . . [which] works a structural constitutional violation"). Because he fails to develop that argument, or his standing to assert it, Williams has therefore forfeited the claim. *See Abdullah v. Obama*, 753 F.3d 193, 199 (D.C. Cir. 2014) (A "bare and conclusory

assertion" in the opening brief "fail[s] to preserve the claim."); *N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work."). The only remaining issues on appeal are: (1) whether the district court erred in denying Williams's motion to amend the first amended complaint, and (2) whether Williams has Article III standing to bring his claims in federal court. We affirm as to both.

## A. ANY ERROR IN THE DENIAL OF WILLIAMS'S MOTION TO AMEND WAS HARMLESS

Under Fed. R. Civ. P. 15(a)(2), when unable to do so as-of-right, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." We review a district court's denial of a motion to amend a complaint for abuse of discretion. *See Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 53 (D.C. Cir. 2015). Under our case law it is an abuse of discretion for a district court to deny leave to amend without providing a reasoned justification for the denial. *See Barkley v. U.S. Marshals Serv.*, 766 F.3d 25, 38 (D.C. Cir. 2014) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). In this case, the district court denied Williams's motion to file a second amended complaint in a minute order lacking any reasons for the denial. Such an unsubstantiated order may amount to an abuse of discretion. *Barkley*, 766 F.3d at 38. However, this omission of reasons is at worst harmless error.

Governing law permits litigants to amend their pleadings "in . . . appellate courts" to cure "[d]efective allegations of jurisdiction . . . ." 28 U.S.C. § 1653. As noted above, Williams filed both a § 1653 motion and an amended

complaint (the "Proposed Amended Complaint") with this Court. "Courts may deny a motion to amend a complaint as futile . . . if the proposed claim would not survive a motion to dismiss." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996). Accordingly, because we hold that Williams's Proposed Amended Complaint fails to state a plausible basis for standing, we deny the pending § 1653 motion as futile and affirm the district court's minute order. *See* 28 U.S.C. § 2111 (Appellate courts must disregard "errors or defects which do not affect the substantial rights of the parties.").

## B. WILLIAMS LACKS ARTICLE III STANDING

### 1. Standard of Review

We review the district court's standing determinations de novo. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). "To survive a motion to dismiss for lack of standing, a complaint must state a plausible claim that the plaintiff has suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." *Humane Soc'y v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). While we accept all "well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor," we do not assume the truth of legal conclusions. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). Neither do we accept "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).

### 2. Williams Does Not Allege a Cognizable Injury-In-Fact

The operative complaint before the district court was Williams's first amended complaint. *See* J.A. 2. This complaint clearly fails to allege a plausible basis for standing. Williams asserts only that he holds United States public debt and "avers direct, individual, concrete, and certainly impending harm from the unconstitutional debt ceiling statute." J.A. 20 ¶ 39; *cf. id.* at 5-6 ¶ 1 (noting the "threat[] [of] Defendants' arbitrary default on Plaintiff's securities"); *id.* at 27 ¶ 50 (alleging "concrete and certainly impending harm"). Because such conclusory statements and legal conclusions are insufficient to state a plausible basis for standing, *Iqbal*, 556 U.S. at 663, Williams can only avoid dismissal if the Proposed Amended Complaint accompanying his § 1653 motion with this Court cures the defect, *see James Madison Ltd. by Hecht*, 82 F.3d at 1099. We therefore focus our attention on the Proposed Amended Complaint.

In that complaint, Williams alleges past, current, and future harms from the Debt Limit Statute to his public debt holdings. Specifically, Williams discusses how the market devalued public debt as a result of the 2013 "default crisis," including, for example, how "[o]n October 15, 2013, interest rates on commercial interbank loans were lower than interest rates on Treasury bills." Pr. Am. Compl. ¶¶ 30-35. As to current harms, Williams claims that the Debt Limit Statute degrades the low-risk profile of his investments and devalues those investments. *Id.* ¶¶ 2, 21, 30, 41, 44. Such harms supposedly worsen when the Treasury Department resorts to "extraordinary measures" following breach of the debt ceiling. *Id.* ¶¶ 4, 45. Williams also alleges that he suffered and continues to suffer noneconomic harms in the form of "increasing[] worry and concern" about his public debt

investments. *Id.* ¶¶ 2, 21. Finally, Williams avers to "certainly-impending" future economic and noneconomic harms from the full enforcement of the Debt Limit Statute— i.e., an actual default on United States debts. *Id.* ¶¶ 4, 45, 50.

Williams's allegations of past injury are irrelevant to the standing inquiry in this case. We stated in *Arpaio v. Obama* that, where a plaintiff "seeks prospective declaratory and injunctive relief, he must establish an ongoing or future injury that is 'certainly impending'; he may not rest on past injury." 797 F.3d at 19. Williams seeks "a declaratory judgment that the debt ceiling statute is unconstitutional" along with a permanent injunction prohibiting enforcement of the statute. Pr. Am. Compl. at 60-61. He therefore must rely on concrete and particular current or future injuries-in-fact to establish standing.

Unfortunately for Williams, his claims of future injuries are entirely conjectural. It is indisputable that the United States has never defaulted on its debt obligations. *See Williams v. Lew*, 77 F. Supp. 3d 129, 132-33 (D.D.C. 2015); Appellees' Br. 3. Further, as the district court correctly noted, any future injury that Williams might suffer follows from an extended chain of contingencies. *Williams v. Lew*, 77 F. Supp. 3d at 133. In particular: (1) federal debt must reach the statutory ceiling; (2) the Treasury Department must exhaust any "extraordinary measures" to avoid a default; (3) the United States must be unable to pay its obligations with "cash on hand" in a given day; (4) payment on Williams's securities must come due during such time; and (5) Williams must continue to hold those securities. *Id.* Furthermore, Congress must fail to enact legislation suspending or increasing the debt limit despite an impending breach of the statutory ceiling— something it has done on over seventy occasions since 1962. *See* Austin, *supra*, at 8. "When considering any chain of

allegations for standing purposes, we may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties) . . . ." *Arpaio*, 797 F.3d at 21 (citation and internal quotation marks omitted). Because Williams fails plausibly to allege that any future injuries are "*certainly impending* to constitute injury in fact," he cannot rely on such injuries to establish Article III standing. *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (citation and internal quotation marks omitted) (emphasis in original).

Thus, in order to satisfy Article III's standing requirements, Williams must put forth plausible allegations of current and ongoing injuries. An analysis of the Proposed Amended Complaint shows that Williams fails to meet this standard. The crux of Williams's argument is that the Debt Limit Statute degrades the risk profile of his public debt holdings and devalues those investments. To support this position, Williams cites in his briefs, but not in the complaint, a July 2015 report from the Government Accountability Office ("GAO") discussing the market effects of "debt limit impasses." *See* U.S. Gov't Accountability Office, *DEBT LIMIT: Market Response to Recent Impasses Underscores Need To Consider Alternative Approaches* (2015) [hereinafter GAO Report], http://www.gao.gov/assets/680/671286.pdf. The GAO Report admittedly details numerous effects that the 2011 and 2013 debt limit impasses had on U.S. financial markets. For example, investors avoided "at-risk" Treasury securities; interest rates on "at-risk" securities rose; the liquidity of "at-risk" securities declined; investors substituted "at-risk" Treasury securities for other investments; and investors refused to accept "at-risk" Treasury securities as collateral. *Id.* at 12-28.

The Court may take judicial notice of the GAO Report. *See* Fed. R. Evid. 201(b); *see also Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) ("And, [i]n determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." (alteration in original) (citation and internal quotation marks omitted)). However, the GAO Report does not make Williams's alleged current injuries plausible. To the contrary, the report suggests that prior debt limit impasses only affected "at-risk" Treasury securities, i.e., holdings with payments due *during the impasse*. *See, e.g.*, GAO Report 13 ("Market participants said that investors were primarily concerned with shorter-term Treasury bills that were maturing during this time [late-October through mid-November 2013]."); U.S. Gov't Accountability Office, *GAO Highlights: Highlights of GAO-15-476, A Report to the Congress* 1 (2015), http://www.gao.gov/assets/680/ 671287.pdf ("During the 2013 debt limit impasse, investors reported taking the unprecedented action of systematically avoiding certain Treasury securities—those that matured around the dates when the [Treasury Department] projected it would exhaust . . . extraordinary measures . . . ."). Williams's current investment holdings are not "at-risk." As the Treasury Department states, the Debt Limit Statute is suspended until March 15, 2017. *See* Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 901(a). Any effect that the Debt Limit Statute's specter may have on Williams's current public debt holdings is therefore speculative and made no less so by the allegations in the Proposed Amended Complaint. *See Lujan*, 504 U.S. at 560 (injury-in-fact cannot be "conjectural" or "hypothetical"). Nor is it clear that Williams's securities will become "at-risk" in the future. Because Congress has suspended the Debt Limit Statute, Williams must rely on rote

conjecture that another debt limit impasse will occur once the suspension ends. *See id.*

Furthermore, Williams's alleged noneconomic injuries do not provide a plausible basis for standing. For the reasons stated above, any current harm to Williams's investments is speculative, and he fails to allege future harms that are certainly impending. The Court cannot exercise jurisdiction based on "worr[ies] and concern[s]" that lack a reasoned basis. Pr. Am. Compl. ¶ 2; *see Clapper*, 133 S. Ct. at 1151 ("[R]espondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.").

### 3. Williams Separately Lacks Standing To Pursue His Due Process Claims

Williams asserts a Fifth Amendment due process violation based on the Treasury Department's "arbitrary" enforcement of the Debt Limit Statute. Pr. Am. Compl. ¶¶ 5, 11, 21, 46. In particular, Williams alleges that the Treasury Department cannot prioritize payments to holders of public debt in the event of default, *id.* ¶ 5, and it "has no rational method to protect Treasury bondholders, insure Certificate of Indebtedness liquidity, or honor promises to repay the TSP G Fund in the certain event of default," *id.* ¶ 46. This claim turns entirely on hypothetical future injury from the arbitrary prioritization of Treasury funds and therefore fails plausibly to allege a cognizable injury-in-fact. *Lujan*, 504 U.S. at 560; *see also Williams v. Lew*, 77 F. Supp. 3d at 133 n.4 (noting that "no . . . plan or policy for prioritizing debt payments has even been formed" by the Treasury Department).

### 4. The Court Need Not Reach the Treasury Department's Remaining Arguments

The Treasury Department also argues that we should dismiss Williams's claims as "generalized grievances" that "do not state an Article III case or controversy." *Lujan*, 504 U.S. at 574. We need not parse the line between a "generalized grievance" and a "concrete, though widely shared" injury-in-fact. *FEC v. Akins*, 524 U.S. 11, 23-24 (1998). Williams fails to allege plausible facts to establish the "irreducible constitutional minimum of standing," *Lujan*, 504 U.S. at 560, thereby obviating the generalized grievance issue. For the same reason, we find it unnecessary to revisit our prior cases discussing the availability, or lack thereof, of "bondholder standing." *See Reuss v. Balles*, 584 F.2d 461, 469-70 n.29 (D.C. Cir. 1978); *cf. Riegle v. FOMC*, 656 F.2d 873, 876 (D.C. Cir. 1981); *Comm. for Monetary Reform v. Bd. of Govs. of Fed. Reserve Sys.*, 766 F.2d 538, 540 (D.C. Cir. 1985).

We therefore affirm the district court's dismissal of Williams's claims for lack of standing.

### C. WILLIAMS'S FACIAL CHALLENGE TO THE DEBT LIMIT STATUTE DOES NOT PROVIDE AN INDEPENDENT BASIS FOR STANDING

In the alternative, Williams cryptically alleges that his facial challenge to the Debt Limit Statute is sufficient to confer Article III standing. Williams's argument is itself facially suspect, and it is also unavailing under the Supreme Court's and our case law.

As the Supreme Court stated explicitly in *Lujan*, the three elements of standing—i.e., injury-in-fact, traceability, and

redressability—encompass "the irreducible constitutional minimum" under Article III. 504 U.S. at 560. Absent any one of these requirements, federal courts lack jurisdiction to adjudicate a plaintiff's claims. As the Court stated in *Bond v. United States*, 564 U.S. 211, 225 (2011), "If . . . a litigant who commences suit fails to show actual or imminent harm that is concrete and particular, fairly traceable to the conduct complained of, and likely to be redressed by a favorable decision, the Federal Judiciary cannot hear the claim." By contrast, "the threshold for facial challenges is a species of third party (*jus tertii*) standing, which . . . [is] a prudential doctrine and not one mandated by Article III of the Constitution." *City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999) (Stevens, J., joined by Souter and Ginsburg, JJ.); *see also LaRoque v. Holder*, 650 F.3d 777, 791-92 (D.C. Cir. 2011) (stating the "prudential principle" limiting third-party standing); *Anderson v. Holder*, 647 F.3d 1165, 1172 (D.C. Cir. 2011) ("The traditional rule is that a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." (citation and internal quotation marks omitted)).

Because, as demonstrated above, Williams fails to allege plausible facts to establish the "irreducible constitutional minimum" requirements for Article III standing under *Lujan*, 504 U.S. at 560, the district court also properly dismissed his facial challenge to the Debt Limit Statute. Williams cites *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954), for the proposition that a facial violation of a constitutional interest confers jurisdiction on the federal courts. But Williams misreads that case. The plaintiffs in *Brown* each suffered an injury-in-fact—"they [were] denied admission to schools attended by white children under laws requiring or permitting segregation according to race." *Id.* at 488. "This segregation

was alleged to deprive the plaintiffs of the equal protection of the laws under the Fourteenth Amendment." *Id.* Furthermore, the Supreme Court has expressly disavowed the theory that Williams advances here; "an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." *Allen v. Wright*, 468 U.S. 737, 754 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014).

We recognize that the contours of Article III standing with respect to facial constitutional challenges may be imprecise. *Compare Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 38-40 (1999) (citing cases in which the Court permitted facial challenges but reaffirming the "traditional rule" limiting such claims), *and United States v. Szabo*, 760 F.3d 997, 1003-04 (9th Cir. 2014) ("While an overbreadth challenge may be brought where a statute is constitutional as applied to the individual challenging it, such challenges are exceptions to the ordinary standing requirements, and are not 'casually employed.'"), *with Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908, 910 (7th Cir. 2015) (noting that "the Supreme Court has entertained both broad facial challenges and pre-enforcement as-applied challenges to abortion laws brought by physicians on behalf of their patients" (quoting *Isaacson v. Horne*, 716 F.3d 1213, 1221 (9th Cir. 2013))), *and Dickerson v. Napolitano*, 604 F.3d 732, 743 n.11 (2d Cir. 2010) ("One potential case where an as-applied challenge may not be permitted . . . but a facial challenge still conceivably could be permissible would be a challenge to a law that had not yet been, but potentially could be, applied unconstitutionally to the party challenging it."). *See generally Toghil v. Commonwealth*, 768 S.E.2d 674, 678 (Va. 2015) (requiring an appellant making a facial challenge to "show[] . . . that the

statute in question is unconstitutional as applied to him and that the statute in question would not be constitutional in any context" and citing federal court cases).

But we know of no case stating that a facial challenge to the constitutionality of a statute itself suffices to establish standing, nor do we adopt such a holding. Unless there is an actual Article III "Case[]" or "Controvers[y]" before us, we lack jurisdiction. *See* U.S. Const. art. III, § 2, cl. 1; *Lujan*, 504 U.S. at 559-60; *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 174 (D.C. Cir. 2012) ("The application of the standing doctrine . . . ensures that federal courts act only within their constitutionally prescribed role: resolving 'Cases' and 'Controversies,' those disputes which are appropriately resolved through the judicial process." (citations and internal quotation marks omitted)). Because Williams does not make this constitutionally mandated showing, we therefore affirm the district court's dismissal of his claim that the Debt Limit Statute is facially unconstitutional.

## III.   CONCLUSION

We express no opinion on the merits of Williams's constitutional claims. For the reasons stated herein, the Court affirms both the district court's order denying Williams's motion to amend his complaint and the order dismissing Williams's claims for lack of standing. Williams's motion under 28 U.S.C. § 1653 to amend his complaint on appeal is accordingly denied.

*So ordered.*