# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 24, 2022   Decided March 17, 2023

No. 21-7120

DARRYL LEWIS,
APPELLANT

v.

KALEV MUTOND, IN HIS INDIVIDUAL CAPACITY ONLY,
ADMINISTRATEUR GENERALE, AGENCE NATIONALE DE
RENSEIGNEMENTS, DEMOCRATIC REPUBLIC OF THE CONGO
AND ALEXIS TAMBWE MWAMBA, IN HIS INDIVIDUAL CAPACITY
ONLY, MINISTRE DE LA JUSTICE, GARDE DES SCEAUX ET
DROITS HUMAINS, DEMOCRATIC REPUBLIC OF THE CONGO,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-01547)

*Brette A. Peña* argued the cause for appellant. With her on the briefs were *Merrill C. Godfrey* and *Jehanne McCullough*.

*Stephen K. Wirth* argued the cause for appellees. With him on the brief were *Raul R. Herrera* and *R. Stanton Jones*.

Before: KATSAS, RAO, and CHILDS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* CHILDS.

Concurring opinion filed by *Circuit Judge* RAO.

CHILDS, *Circuit Judge*: Appellant Darryl Lewis, a United States citizen and veteran, alleges Appellees Kalev Mutond and Alexis Tambwe Mwamba (Foreign Officials) detained and tortured him in the Democratic Republic of the Congo (DRC). Lewis argues that the Foreign Officials did so to extract a false confession that he was an American mercenary. That is enough, in Lewis' view, to establish that the district court had personal jurisdiction over the Foreign Officials. If not, he asserts alternatively that jurisdictional discovery is warranted. We disagree and affirm the district court on both questions.

**I.**

**A.**

In 2016, Lewis was a security advisor to a former DRC presidential candidate. That same year, Kalev Mutond was the General Administrator of the DRC's National Intelligence Agency (ANR), and Alexis Tambwe Mwamba was the DRC's Minister of Justice.

The Foreign Officials allegedly acted in concert to detain and torture Lewis for over six weeks in violation of the Torture Victim Protection Act (TVPA). Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at note following 28 U.S.C. § 1350). He was interrogated for hours, fed small meals at irregular intervals, deprived of sleep, and denied essential hygiene products. Neither Lewis' employer, family, nor counsel could contact him.

The purported goal of Lewis' detention was to extract a false confession that he was one of many American mercenaries working with the then-DRC President's political opponent to undermine the government. While in prison, Official Mutond taunted him with the accusation. Compl. ¶ 31, J.A. 11. After Lewis failed to confess, Official Tambwe publicly claimed at a press conference that Lewis was a mercenary sent to assassinate the then-President of the DRC. Official Tambwe's supposed proof was two-fold: first, he showed a picture of Lewis carrying a machine gun; second, he contended that since October 2015, 600 United States citizens, men, and ex-soldiers entered the DRC as part of a "plot" to "destabilize" its government. Compl. ¶ 35, J.A. 12. Accordingly, Official Tambwe ordered the DRC's prosecutor general to explore whether Lewis' former boss, the opposition presidential candidate, had American and South African mercenaries working for him. Lewis alleges, however, that the Foreign Officials routinely single out Americans "because they are Americans and, in the case of veterans[,] . . . because they are veterans." Compl. ¶ 39, J.A. 12–13.

In response to the Foreign Officials' allegations of American involvement, the United States Embassy in the DRC released a statement that denied the claims by Official Tambwe. Compl. ¶ 40, J.A. 13. It stated, "We are aware of the detention . . . of an American citizen who was working in Katanga as a security advisor. [] Lewis was not armed and allegations he was involved in mercenary activity are false." Compl. ¶ 40, J.A. 13; *U.S. Embassy Concerned About Reported False Accusations of Mercenary Activities*, U.S. Embassy in the Democratic Republic of the Congo (May 5, 2016), https://cd.usembassy.gov/u-s-embassy-concerned-

reported-false-accusations-mercenary-activities/ (last visited Jan. 2023).[1]

**B.**

The district court dismissed Lewis' complaint for lack of personal jurisdiction. It also denied Lewis' request for jurisdictional discovery.

Lewis timely appealed. We have appellate jurisdiction under 28 U.S.C. § 1291. We review the district court's dismissal for lack of personal jurisdiction de novo and the denial of jurisdictional discovery for abuse of discretion. *Livnat v. Palestinian Auth.*, 851 F.3d 45, 48 (D.C. Cir. 2017).

**II.**

On appeal, the first question is whether the district court erred by granting the Foreign Officials' motion to dismiss the complaint for lack of personal jurisdiction. Specifically, we must answer whether the Foreign Officials purposefully availed themselves of the United States by torturing Lewis to extract a false confession that he was an American mercenary. We think not.

---

[1] At the motion to dismiss stage, we can take judicial notice of facts incorporated by reference into the complaint. *See Singletary v. Howard Univ*., 939 F.3d 287, 293 n.1 (D.C. Cir. 2019); *see also Williams v. Lew*, 819 F.3d 466, 473 (D.C. Cir. 2016) (citing *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013)).

5

**A.**

Only two types of personal jurisdiction can provide a home for Lewis' theory. The first is general jurisdiction, and "the paradigm forum for the exercise of general jurisdiction [for an individual] is the individual's domicile." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). Because the Foreign Officials are domiciled in the DRC, general jurisdiction does not exist. Appellant's Br. 12; Compl. ¶ 8, J.A. 7.

Without general jurisdiction, Lewis must establish specific jurisdiction over the Foreign Officials. Interpreting the Fourteenth Amendment's Due Process Clause, the Supreme Court has long held that specific jurisdiction is proper when a defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). The defendant's contacts must be "purposefully directed," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (citation omitted), at the forum to establish "foreseeability . . . that the defendant's conduct and connection with the forum . . . are such that he should reasonably anticipate being haled into court there." *Id.* at 474 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)); *see also Mwani v. bin Laden*, 417 F.3d 1, 12 (D.C. Cir. 2005) (making clear that when answering whether a court has specific jurisdiction over a foreign defendant, the question is whether the foreign defendant purposefully availed himself of the forum). And a plaintiff's claims must "aris[e] out of or relat[e] to the defendant's contacts with the forum." *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1780 (2017) (alterations in

original) (emphasis removed) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014)).

Lewis does not seek specific jurisdiction under the Fourteenth Amendment pursuant to Federal Rule of Civil Procedure 4(k)(1). That would establish personal jurisdiction over a domestic defendant in a particular state. Compl. ¶ 7, J.A. 7; Fed. R. Civ. P. 4(k)(1). Instead, Lewis asserts jurisdiction under the Fifth Amendment over a foreign defendant according to Rule 4(k)(2). Compl. ¶ 7, J.A. 7; Fed. R. Civ. P. 4(k)(2)(B) (requiring that so long as a defendant is not subject to general jurisdiction, exercising personal jurisdiction may be appropriate if "consistent with the United States Constitution and laws"). Rule 4(k)(2) permits specific jurisdiction if the defendant has, among other things, "affiliating contacts with the United States sufficient to justify the exercise of personal jurisdiction over that party." Fed. R. Civ. P. 4(k) advisory committee's notes to 1993 amendments.

True, the Supreme Court has yet to explicitly consider whether the Fifth Amendment's Due Process Clause requires the same minimum contacts to establish specific jurisdiction as under the Fourteenth Amendment. *Bristol-Myers Squibb Co.*, 137 S. Ct. at 1784 ("[W]e leave open the question whether the Fifth Amendment imposes the same restrictions [as the Fourteenth] on the exercise of personal jurisdiction by a federal court."). However, most sister circuits and this Court agree that little jurisdictional daylight exists between the two Amendments. *Livnat*, 851 F.3d at 54–55.[2] We have made clear

---

[2] *See also e.g.*, *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 235 (5th Cir. 2022) (en banc) ("We . . . hold that the Fifth Amendment due process test for personal jurisdiction requires the same 'minimum contacts' with the United States as the Fourteenth Amendment requires with a state."); *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 330 (2nd Cir. 2016) ("This Court's

precedents clearly establish the congruence of due process analysis under both the Fourteenth and Fifth Amendments."); *Xilinx, Inc. v. Papst Licensing GmbH & Co. KG*, 848 F.3d 1346, 1352–53, 1353 n.2 (Fed. Cir. 2017) ("[W]e have applied the Supreme Court's jurisprudence of personal jurisdiction regarding the demands of the Fourteenth Amendment's Due Process Clause to [the Fifth Amendment]."); *Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 443–44 (4th Cir. 2015) (holding that absent a federal statute requiring nationwide service of process, the "'minimum contacts' standard . . . [applies] when assessing whether personal jurisdiction is consistent with the Due Process Clause of the Fourteenth Amendment"); *KM Enters., Inc. v. Glob. Traffic Techs.*, 725 F.3d 718, 731 (7th Cir. 2013) (holding that when a federal statute provides for nationwide service of process, "due process requires only that [a defendant] have sufficient minimum contacts with the United States as a whole to support personal jurisdiction"); *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004) (citation omitted) ("In a statute providing for nationwide service of process, the inquiry to determine 'minimum contacts' is thus 'whether the defendant has acted within any district of the United States or sufficiently caused foreseeable consequences in this country.'"); *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 369 (3d Cir. 2002) ("[We] hold that a federal court's personal jurisdiction may be assessed on the basis of the defendant's national contacts when the plaintiff's claim rests on a federal statute authorizing nationwide service of process."); *Med. Mut. of Ohio v. deSoto*, 245 F.3d 561, 567–68 (6th Cir. 2001) ("[W]hen a federal court exercises jurisdiction pursuant to a national service of process provision, it is exercising jurisdiction for the territory of the United States and the individual liberty concern is whether the individual over which the court is exercising jurisdiction has sufficient minimum contacts with the United States."); *United States. v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001) ("Whereas state long-arm statutes require a showing that the parties have sufficient contacts with the forum state, Rule 4(k)(2) requires a showing that the parties have sufficient contacts with the United States as a whole."); *Republic of Panama v. BCCI Holdings*

even recently that "[a]part from the scope of the forum and potential federalism considerations, the Fifth and Fourteenth Amendment Due Process inquiries are generally analogous." *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 232 (D.C. Cir. 2022). Exceptions occur when the Fifth Amendment does not cover a particular entity, such as States of the Union or sovereign foreign states, not when foreign persons are involved. *South Carolina v. Katzenbach*, 383 U.S. 301, 323–324 (1966); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002).

With respect to foreign defendants, a plaintiff's complaint must "make a *prima facie* showing of the pertinent jurisdictional facts." *Livnat*, 851 F.3d at 56–57 (citation omitted); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (holding that a complaint's allegations should "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'"). Resolving factual disputes in favor of the plaintiff, such jurisdictional facts are plausible if they allow a "court to draw the reasonable inference that the defendant" intended to target the United States. *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The Fifth Amendment's Due Process Clause requires "meaningful 'contacts, ties, or relations[]'" with the United States to create a "'fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign.'" *Mwani*, 417 F.3d at 11 (second alteration in original) (quoting *Burger King Corp.*, 471 U.S. at 472). But if a plaintiff's assertions are mere "'[c]onclusory statements' or a 'bare allegation of conspiracy

---

*(Luxembourg) S.A.*, 119 F.3d 935, 946–47 (11th Cir. 1997) ("A court must . . . examine a defendant's aggregate contacts with the nation as a whole rather than his contacts with the forum state in conducting the Fifth Amendment analysis.").

or agency'" such that they "merely state the plaintiff['s] theory of specific jurisdiction[,]" then exercising specific jurisdiction is improper. *Livnat*, 851 F.3d at 57 (quoting *First Chi. Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378–79 (D.C. Cir. 1988)).

This Court's precedents foreclose Lewis' jurisdictional theory that the Foreign Officials tortured him because they believed he was an American mercenary.  To start, torture alone of an American abroad, unless directed at the United States, is "insufficient to satisfy the usual 'minimum contacts' requirement." *Price*, 294 F.3d at 95.  Lewis argues that *Price* is distinguishable because only its dicta are relevant to this case.  Not so.

*Price* is an analogous situation.  There, the petitioners were two American citizens who alleged torture and detainment in Libya.  After the Americans photographed sites around a city in Libya, Libyan officials arrested them because the officials "believed that the[] photographs constituted anti-revolutionary propaganda." *Id.* at 86.  The officials then imprisoned them for 105 days, where they were subject to various forms of physical and mental abuse. *Id.*  The petitioners, too, claimed that their detention targeted the United States. *See id.* at 86, 95.  However, this Court made clear that even if Libya was a "person" capable of jurisdictional reach under the Fifth Amendment, "torture[] [of] two American citizens in Libya . . . would be insufficient to satisfy the usual 'minimum contacts' requirement." *Id.* at 95.

Still, Lewis believes that the Foreign Officials' "propaganda campaign" to frame him as an American mercenary sufficiently targeted the United States.  Appellant's Br. 14.  For support, he asks this Court to narrow *Mwani*'s holding to require only that a foreign defendant "engage[] in unabashedly malignant actions directed at [and] felt in" the

United States. *Mwani*, 417 F.3d at 4 (second alteration in original) (quoting *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349 (D.C. Cir. 2000)); Appellant's Br. 15. That reading divorces this Court's interpretation of the minimum contacts necessary to satisfy such a standard. *Mwani*, 417 F.3d at 13.

In *Mwani*, the contacts directed at the United States by Osama bin Laden and al Qaeda were substantial: petitioners pointed to at least three separate terrorist attacks orchestrated by the defendants—the 1993 World Trade Center bombing in New York; the 1998 plot to bomb the United Nations Federal Plaza and the Lincoln and Holland Tunnels in New York; and the 1998 bombing of the American Embassy in Nairobi. *Id.* The reason those contacts aimed at the United States were evident of "unabashedly malignant actions" was because the Nairobi attack (i) was orchestrated to "kill both American and Kenyan employees . . ."; (ii) it was designed to "cause pain and sow terror in the embassy's home country, the United States"; and (iii) in light of the two prior attacks, the Nairobi attack was part of "an ongoing conspiracy to attack the United States . . . ." *Id.*

None of *Mwani*'s forum-directed activity occurred here. The only ongoing conspiracy Lewis submits has everything to do with the DRC's politics rather than the United States. Official Tambwe claimed 600 United States citizens entered the DRC to destabilize it since October 2015 and then ordered an investigation into whether the American and South African citizens, who were currently working for the opposition presidential candidate, were mercenaries. Compl. ¶¶ 32–33, 35, J.A. 11–12. Accordingly, the fact that Lewis is an American was incidental to the Foreign Officials' chief concern: that mercenaries—whether American or South African—were attempting to influence the DRC's presidential

elections. *See Mwani*, 417 F.3d at 13 (noting that a plaintiff's nationality does not necessarily defeat specific jurisdiction); *see also Twombly*, 550 U.S. at 567 (noting that courts should note a complaint's "obvious alternative explanation").

The Foreign Officials cannot be haled into an American court just because Lewis concludes that their motivation was against the United States. Specifically, Lewis argues, "other Americans have been singled out by [the Foreign Officials] for persecution . . . because they are Americans and, in the case of veterans[,] such as Mr. Lewis, because they are veterans." Compl. ¶ 39, J.A. 12–13. Yet, he offers no further allegation to explain these past occurrences in detail, like whether the Foreign Officials specifically targeted the United States in the past. In *Livnat*, this Court rejected the petitioner's conclusory allegation that the Palestinian Authority had a "general practice of using terrorism to influence United States public opinion and policy . . . ." *Livnat*, 851 F.3d at 57 (citation and internal quotation marks omitted). So, here, too, Lewis "merely stat[ing] [his] theory of specific jurisdiction" is not enough to transform the theory into a grant of personal jurisdiction over the Foreign Officials. *Id.*

Lewis' final support for his jurisdictional theory is that the Foreign Officials' actions against him attempted to entangle the United States in a geopolitical conflict. Oral Arg. Tr. 9:6–18. Attempting to distinguish *Livnat*, Lewis argues that petitioners there consequentially failed to describe how the attack at Joseph's Tomb was part of the Palestinian Authority's plot to influence United States policy. Appellant's Br. 21; *Livnat*, 851 F.3d at 57. But Lewis' theory is even more wanting: that two lone DRC Officials, in their individual capacities, intended to entangle the United States in a geopolitical conflict over their own national election. Compl. ¶¶ 4–5, J.A. 6. At least in *Livnat*, the relationship between the Palestinian Authority,

Israel, and their governmental organizations was uniquely "[e]stablished following the 1993 Oslo Accords." *Livnat*, 851 F.3d at 47. Here, however, without any other supposed relationship between the Foreign Officials and the United States, it is not plausible that the Foreign Officials meant to avail themselves of the United States by merely accusing American citizens of being mercenaries.

The specific articles referenced in Lewis' complaint embroil his entanglement theory. Lewis argues that at least two of the articles incorporated by reference in his complaint suggest that "the United States was putting a lot of political pressure on the Kabila regime to hold a free and fair election." Oral Arg. Tr. 9:6–12. Because of the DRC's resistance to doing so, the Foreign Officials, says Lewis, attempted to influence the United States' foreign policy. *See* Oral Ag. Tr. 9:11–18. But the highlighted articles contradict Lewis' proposition. Indeed, one article expresses, "It has become clear to many that Lewis has been entangled in a brutal struggle for power *inside* the DRC . . . ." Margaret Brennan, *CBS Exclusive: Family of American Security Contractor Jailed in Congo Pleads for His Freedom*, CBS News (May 19, 2016), https://www.cbsnews.com/news/cbs-exclusive-family-of-american-security-contractor-jailed-in-congo-pleads-for-his-freedom (emphasis added) (last visited Jan. 2023). While that article does reference then-President Obama's efforts to support a free and fair election in the DRC, it is not plausible that the President's effort "ar[ose] out of or relat[ed] to the [Foreign Officials'] contacts with the forum." *Bristol-Myers Squibb Co.*, 137 S. Ct. at 1780 (citation and internal quotation marks omitted). Moreover, although the second article generally recounts Lewis' detention, it does so concluding that the DRC's then-President "[was generally] resisting international calls and rising pressure in Congo to relinquish power by the end of th[e] year, as Congo's Constitution

requires." Jeffrey Gettleman, *Congo Lurches Toward a New Crisis as Leader Tries to Crush a Rival*, New York Times (May 11, 2016), https://www.nytimes.com/2016/05/12/world/africa/congo-moise-katumbi-joseph-kabila.html (last visited Jan. 2023). Because neither article even implies that the Foreign Officials directed their efforts specifically at the United States, we cannot "reasonabl[y] infer[]" that the articles suggest purposeful availment of the United States. *Iqbal*, 556 U.S. at 678 (citation omitted).

The United States Embassy's public denial of Official Tambwe's allegation is equally futile in establishing specific jurisdiction. Lewis maintains that the Embassy's public denial, and its nonpublic diplomatic efforts regarding his detention and torture, confirm that the Foreign Officials intended to target the United States. Oral Arg. Tr. 11:1–18; 12:8–20; Appellant's Br. 5–7. The Embassy's public statement does not support such a theory. It does not suggest that the Foreign Officials attempted to "cause pain and sow terror" in the United States. *Mwani*, 417 F.3d at 13. It does not infer that the Officials' allegations were part of some conspiracy against the United States. *Id.* Instead, the Embassy merely disputed the Foreign Officials' allegations, stating, "We are aware of the detention . . . of an American citizen . . . . [] Lewis was not armed and allegations he was involved in mercenary activity are false." *U.S. Embassy Concerned About Reported False Accusations of Mercenary Activities*, U.S. Embassy in the Democratic Republic of the Congo (May 5, 2016), https://cd.usembassy.gov/u-s-embassy-concerned-reported-false-accusations-mercenary-activities/ (last visited Jan. 2023). Without more, we cannot infer that the Embassy's cursory denunciation is jurisdictionally consequential.

Traditional notions of fair play and substantial justice do not save Lewis' complaint.  Torture is central to proving a TVPA claim.  Pub. L. No. 102-256, § 3(b), 106 Stat. 73 (1992) (codified at note following 28 U.S.C. § 1350).  Lewis no doubt makes troubling allegations of the torture he experienced.  However, his chief argument for why justice warrants personal jurisdiction here depends solely on the TVPA.  And "it is well-settled that 'a statute cannot grant personal jurisdiction where the Constitution forbids it.'"  *Price*, 294 F.3d at 95 (citation omitted).

**B.**

Without personal jurisdiction, Lewis claims that the district court should have permitted jurisdictional discovery.  A district court acts well within its discretion to deny discovery when no "facts additional discovery could produce . . . would affect [the] jurisdictional analysis."  *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1147 (D.C. Cir. 1994).  A plaintiff need only have a "good faith belief" that "reasonable discovery" could "supplement . . . jurisdictional allegations . . . ."  *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C. Cir. 1998) ("good faith belief"); *Second Amend. Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 525 (D.C. Cir. 2001) (citation omitted) ("reasonable discovery"); *GTE New Media Servs. Inc.*, 199 F.3d at 1351 ("supplement . . . jurisdictional allegations"); *see also Urquhart-Bradley v. Mobley*, 964 F.3d 36, 48 (D.C. Cir. 2020) (citation and internal quotation marks omitted) ("[I]f a party demonstrates that it can supplement its jurisdictional allegations through discovery, then jurisdictional discovery is justified.").  But the discovery request cannot be a "fishing expedition."  *Bastin v. Fed. Nat'l Mortg. Ass'n*, 104 F.3d 1392, 1396 (D.C. Cir. 1997).

Some confusion exists about Lewis' precise justification for jurisdictional discovery. In his appellate brief, he requested jurisdictional discovery "to obtain additional evidence demonstrating [the Foreign Officials'] intended effect on the United States, evidence that goes beyond the showing of torture itself." Appellant's Br. 26. His reply brief strengthened his ask, seeking "emails and other correspondence concerning the allegations in the complaint, and depositions of the [Foreign Officials]." Reply Br. 14–15.

Regardless, the district court did not abuse its discretion when it denied jurisdictional discovery. Each argument that Lewis submits on appeal does not "cure [his] failure to tie [his] jurisdictional theory to [his] attack . . . ." *Livnat*, 851 F.3d at 58. Indeed, the district court denied Lewis' jurisdictional discovery request because he failed to describe "specific ways to supplement his allegations." J.A. 27. Requesting relevant correspondence from the Foreign Officials is likely to be a fishing expedition because it is unlikely to uncover that they were part of any scheme to target the United States. Nevertheless, because Lewis failed to make any specific discovery requests until his reply brief, that argument is waived on appeal. *New York Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007) ("[I]n order to prevent the 'sandbagging' of another party, 'we have generally held that issues not raised until the reply brief are waived.'" (citation omitted)).

## III.

Lewis failed to demonstrate that exercising specific jurisdiction over the Foreign Officials, in this case, would meet the requirements of the Fifth Amendment's Due Process Clause. And he also failed to describe particular ways in which jurisdictional discovery would cure his complaint's defect.

Therefore, we affirm the district court's grant of the Foreign Officials' motion to dismiss for lack of personal jurisdiction and its denial of Lewis' request for jurisdictional discovery.

*So ordered.*

RAO, *Circuit Judge*, concurring: Under circuit precedent, we have no personal jurisdiction over Darryl Lewis's claims because he has not plausibly alleged the required minimum contacts with the United States as a whole. I concur in the panel opinion but write separately to note that there are reasons to reconsider whether the personal jurisdiction limits required by the Due Process Clause of the Fifth Amendment are identical to those of the Fourteenth.

Shortly after this circuit held the same personal jurisdiction standards apply under the Fifth and Fourteenth Amendments, *Livnat v. Palestinian Authority*, 851 F.3d 45, 54 (D.C. Cir. 2017), the Supreme Court declared it was an "open" question whether the Fifth Amendment imposes the same due process limits as the Fourteenth, *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773, 1783–84 (2017). While the parties do not raise this issue, in an appropriate case we should reassess what limits the Fifth Amendment places on the federal courts' exercise of personal jurisdiction over foreign defendants.

* * *

Lewis sued two Congolese officials in federal district court, alleging they imprisoned and tortured him. Lewis's cause of action arose under the Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at note to 28 U.S.C. § 1350). To establish personal jurisdiction, he invoked Federal Rule of Civil Procedure 4(k)(2). That Rule allows a plaintiff to "establish[] personal jurisdiction over a defendant" who "is not subject to jurisdiction in any state's courts of general jurisdiction" simply by "serving a summons" on him. FED. R. CIV. P. 4(k)(2); *see also Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 231–32 (D.C. Cir. 2022) (explaining Rule 4(k) "is essentially a federal long-arm statute"). No party contests that Lewis has a cause of action under federal law or that Lewis properly served the Congolese defendants in

compliance with Rule 4(k). The only question is whether asserting personal jurisdiction would be "consistent with the United States Constitution." FED. R. CIV. P. 4(k)(2)(B). In federal court, that query focuses on the limits imposed by the Fifth Amendment's Due Process Clause.

In *Livnat*, we determined the "usual" Fourteenth Amendment specific jurisdiction requirements also apply to the Fifth Amendment inquiry. 851 F.3d at 56. We must therefore consider whether the defendant has the requisite "minimum contacts" with "the United States as a whole." *Id.* at 55; *cf. International Shoe Co. v. Washington*, 326 U.S. 310 (1945). The *Livnat* court gave three reasons for equating the due process protections of the Fifth and Fourteenth Amendments. First, it cited the "uniform" view of our sister circuits and suggested Supreme Court precedent also dictated this result. *Livnat*, 851 F.3d at 54–55. Second, the court could identify no reason to distinguish the two Due Process Clauses. The plaintiffs argued that jurisdiction in the federal courts did not implicate the federalism concerns that arise when evaluating jurisdiction in state courts; however, the court rejected this argument because "personal jurisdiction is not just about federalism." *Id.* at 55. Finally, the court suggested applying the same personal jurisdiction standards in both contexts would be "easier to administer." *Id.* at 55–56.

All three of *Livnat*'s premises have been called into question in the intervening years. First, just a few months after *Livnat*, the Supreme Court expressly left "open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court" as the Fourteenth Amendment imposes on state courts. *Bristol-Myers*, 137 S. Ct. at 1784. The Supreme Court has not yet resolved this open question, although other circuits have followed *Livnat*'s reasoning. *See, e.g.*, *Douglass v. Nippon*

*Yusen Kabushiki Kaisha*, 46 F.4th 226, 234–41 (5th Cir. 2022) (en banc).

Second, recent originalist scholarship suggests there are reasons to distinguish the Fifth and Fourteenth Amendment standards. *See* Stephen E. Sachs, *The Unlimited Jurisdiction of the Federal Courts*, 106 VA. L. REV. 1703 (2020). There is little (or no) evidence that courts and commentators in the Founding Era understood the Fifth Amendment's Due Process Clause to impose a minimum contacts requirement. On the contrary, the widespread assumption was that Congress could extend federal personal jurisdiction by statute. *See Douglass*, 46 F.4th at 260–62 (Elrod, J., dissenting) (surveying early cases and concluding that "none lends support" to applying the minimum contacts test to determine due process limits under the Fifth Amendment).

To provide just a few examples, Justice Story explained that, if Congress had spoken clearly, it could have allowed "a subject of England, or France, or Russia … [to] be summoned from the other end of the globe to obey our process, and submit to the judgment of our courts." *Picquet v. Swan*, 19 F. Cas. 609, 613 (C.C.D. Mass. 1828) (No. 11,134); *see also* Sachs, *Jurisdiction*, 106 VA. L. REV. at 1714–17 (discussing *Picquet*). The court refused to exercise jurisdiction over the defendant (an American expatriate), not because of any constitutional limitation, but because Congress had not provided the necessary authorization. *Picquet*, 19 F. Cas. at 613–15. Ten years later, the Supreme Court described Story's reasoning as "having great force" and adopted the same approach. *Toland v. Sprague*, 37 U.S. (12 Pet.) 300, 328 (1838). The prevailing understanding was that when it came to suits against foreign defendants in federal courts, the reach and limits of personal jurisdiction were governed by Congress.

*Livnat* applied the minimum contacts test to assess personal jurisdiction in the federal courts by importing Fourteenth Amendment due process limits into the Fifth Amendment. *See* Sachs, *Jurisdiction*, 106 VA. L. REV. at 1705 ("[C]urrent doctrine … takes the Fourteenth Amendment as given, and remakes the Fifth Amendment in its image."). Sources of original meaning suggest this may well be a parachronism.

That leaves *Livnat*'s third justification: ease of administration. But the fact that a given approach may be easy to administer does not make it legally correct. Such pragmatic considerations cannot override the proper interpretation of the Constitution.

\* \* \*

There is substantial evidence that the Fifth Amendment does not impose the same due process limits on personal jurisdiction in the federal courts as the Fourteenth Amendment does in the state courts. A reevaluation of the Fifth Amendment's due process protections is best undertaken by the en banc court in an appropriate case with the benefit of full briefing. Because the court today correctly applies our precedent, I concur.